IN THE

TENTH COURT OF APPEALS




 
 
 
 
 
 
 


 



No. 10-05-00394-CR

 

In re
Benito Hinojosa

 

 



Original Proceeding

 

 



MEMORANDUM  Opinion










 

          The petition for writ of mandamus is denied.

 

 

 

                                                          TOM
GRAY

                                                          Chief
Justice

 

Before
Chief Justice Gray,

          Justice
Vance, and

          Justice
Reyna

Writ
Denied

Opinion
delivered and filed January 4, 2006

Do
Not Publish

OT06

 






2>

          Bryan Rauschenberg filed suit against
Bossier Chrysler Dodge II, Inc. dba Bossier Country alleging DTPA violations,
breach of express and implied warranties, and breach of contract, all arising
from his purchase of a diesel pickup from Bossier Country.  A jury found in
favor of Rauschenberg and awarded actual damages of $8,412, additional damages
of $5,000, and attorney’s fees.  Bossier Country presents thirteen issues for
review.  We will affirm in part, reverse and render in part, and suggest a
remittitur.

          Bossier Country contends in its issues
that: 

·       
Rauschenberg lacks standing
or is not entitled to recover in his individual capacity;

 

·       
there is no evidence or
factually insufficient evidence to support the jury’s award for (a) lost
profits, (b) loss of use of the truck, (c) the reasonable value of
Rauschenberg’s time attempting to correct the problems with the repair of the
truck, and (d) out-of-pocket expenses; (four issues)

 

·       
there is no evidence or
factually insufficient evidence that Bossier Country engaged in the deceptive
trade practices alleged;

 

·       
Rauschenberg disclaimed all
warranties as a matter of law;

 

·       
there is no evidence or
factually insufficient evidence that Bossier City failed to comply with any
express or implied warranty;

 

·       
there is no evidence or
factually insufficient evidence that Bossier City intentionally or knowingly
engaged in the deceptive trade practices alleged; (two issues);

 

·       
there is no evidence or
factually insufficient evidence to support the jury’s award of additional
damages;

 

·       
Rauschenberg is not entitled
to attorney’s fees because he failed to prove the alleged DTPA violations; and

 

·       
the attorney’s fee award
must be modified because there is no evidence or factually insufficient
evidence to prove all or part of the damages awarded.

 

Factual Background

          Rauschenberg purchased a 2001 Dodge
3500 diesel pickup from Bossier Country in May 2000.  He also purchased an
extended service contract for the pickup which provided some coverages for up
to 60 months or 100,000 miles.[1]

          Rauschenberg bought the truck for his
son Kelly to use in a “hot-shotting” business.[2]  Rauschenberg
made the monthly payments on the truck with money Kelly gave him from hot-shotting
receipts.[3]  They
agreed that Kelly would keep all monthly net receipts above and beyond the
monthly truck payment until Kelly had satisfied some other debts he owed. 
After that, they intended to share the net receipts equally.

          The truck worked well for them with
relatively few problems until November 2000.  During a delivery to North Carolina, Kelly noticed that the pickup was using an excessive amount of oil.  He
took it to a dealership in Alabama where it was determined that the front seal
was leaking.  Kelly returned to Texas, checking and replenishing the oil
regularly along the way as recommended.  Kelly then took the pickup to Bossier
Country for repair.  A Bossier Country mechanic concluded that the problem lay
with the turbocharger.  After consulting with the engine manufacturer, the
mechanic replaced the turbocharger and other parts and completed the job six
days after Kelly brought the pickup in.

          Rauschenberg testified that the pickup
still had an oil leak when he brought it home and that it could not pull a
trailer.  He returned the pickup to Bossier Country on December 26 complaining
that it had an oil leak and an engine knock, was blowing blue smoke, and was getting
“5 mph loaded—10 empty.”[4]  Bossier
Country replaced the injector pump and recommended that the fuel system be
flushed because it was dirty.  The mechanic’s handwritten notes indicate that
oil on the front of the motor was from the breather trap, which needed
cleaning.  However, there is nothing in the service record to indicate that
this was done.  Rauschenberg declined Bossier Country’s suggestion that the
fuel system be flushed.  The repairs were completed on January 3.

          Rauschenberg testified that the pickup
was still leaking oil after these repairs.  He returned it to Bossier Country
for the last time on January 11.  This time, he complained that it had an oil
leak and an engine knock and was running rough.  Bossier Country prevailed this
time in the recommendation to flush the fuel system.  The mechanic determined
that the pickup was leaking oil around the front engine seal and replaced it.  Bossier
Country spent several weeks making repairs.  Afterward, the engine was steam
cleaned, and no additional oil leaks were detected.

          Bossier Country notified Rauschenberg
on Friday, February 2 that the pickup was ready.  He came the next day,
although Bossier Country’s regular business hours are Monday through Friday. 
No one was there to release the pickup to him.  Bossier Country called Rauschenberg
twice the following week offering to deliver the pickup to him in Gatesville,
about 100 miles from the dealership,[5]
but Rauschenberg did not respond to these offers and left the pickup at Bossier
Country.

          Rauschenberg filed a lemon-law
complaint in April seeking repurchase of the pickup by Bossier Country.[6] 
At some point however, it was determined that Rauschenberg’s only option was to
have the pickup repaired by another dealer, apparently because he did not file
his complaint within six months after the pickup had been driven 24,000 miles.[7] 
Rauschenberg retrieved the pickup from Bossier Country in early July.  He
testified that the pickup continued to leak oil and not run well.  At
DaimlerChrysler’s suggestion, Rauschenberg took the pickup to a dealership in Killeen for repair on July 24.  The Killeen dealership did extensive work on the engine
and determined that it was leaking from a cracked timing cover housing. 
Repairs were completed, and the pickup was returned to Rauschenberg three days
after he took it there.

          Rauschenberg drove the pickup for
several days and determined that the engine was “still leaking [oil] a little
bit.”  He returned it to the Killeen dealership on August 1.  The dealership
identified two additional places where the engine was leaking oil and repaired
them.  The pickup was returned to Rauschenberg on August 3.  By this time, Rauschenberg
was “fed up” with the pickup and traded it in.

Procedural Background

          Rauschenberg’s petition alleges that Bossier
Country committed the following DTPA laundry-list violations:

·       
represented that goods or
services were of a particular standard, quality, or grade, or that goods were
of a particular style or model, when they were of another;

 

·       
knowingly made false or
misleading statements of fact concerning the need for parts, replacement, or
repair service; and

 

·       
represented that work or
services have been performed on, or parts replaced in, goods when the work or
services were not performed or the parts replaced.

 

See
Tex. Bus. & Com. Code Ann. § 17.46(b)(7),
(13), (22) (Vernon Supp. 2005).

          The petition alleges that Bossier
Country breached implied warranties of fitness for a particular purpose and of
good and workmanlike performance and breached the extended warranty which Rauschenberg
purchased when he bought the pickup.  The petition also alleges a general claim
for breach of contract.[8]

          Bossier Country responded with a
general denial and with a verified denial that Rauschenberg was entitled to
recover in his individual capacity.

          The jury found in Rauschenberg’s favor
on all theories submitted.  The jury awarded actual damages of: $2,100 for loss
of use of the pickup; $5,000 for lost profits; $1,000 for the reasonable value
of Rauschenberg’s time used while attempting to have the pickup repaired; and
$312 for out-of-pocket expenses.  The jury awarded additional damages of $5,000
because it found that Bossier Country acted intentionally and knowingly. 
Finally, the jury awarded attorney’s fees of: $6,750 for trial; $2,500 for an
appeal to this Court; and $2,500 for an appeal to the Supreme Court.

Standing

          Bossier Country contends in its first
issue that Rauschenberg does not have standing to pursue the claims asserted in
his petition.

          Standing is generally a question of
law which we determine by review of the factual allegations of the plaintiff’s pleadings. 
See West v. Brenntag Sw., Inc., 168 S.W.3d 327, 334 (Tex. App.—Texarkana
2005, pet. denied); MET-Rx USA, Inc. v. Shipman, 62 S.W.3d 807, 809-10
(Tex. App.—Waco 2001, pet. denied).  We construe the pleadings in favor of the
plaintiff.  See West, 168 S.W.3d at 334; MET-Rx USA, 62 S.W.3d at 810.

          A plaintiff must be a “consumer” to
maintain a DTPA suit.  See Crown Life Ins. Co. v. Casteel, 22 S.W.3d 378,
386 (Tex. 2000); Bynum v. Prudential Residential Servs., Ltd. P’ship,
129 S.W.3d 781, 792 (Tex. App.—Houston [1st Dist.] 2004, pet. denied); Cook-Pizzi
v. Van Waters & Rogers, Inc., 94 S.W.3d 636, 644 (Tex. App.—Amarillo 2002,
pet. denied).  The DTPA defines a “consumer” in pertinent part as “an
individual, partnership, corporation, this state, or a subdivision or agency of
this state who seeks or acquires by purchase or lease, any goods or services.” 
Tex. Bus. & Com. Code Ann. § 17.45(4)
(Vernon 2002); see also Crown Life Ins. Co., 22 S.W.3d at 386; Cook-Pizzi,
94 S.W.3d at 644.  To have standing then, a DTPA plaintiff must be one who has
purchased or leased goods or services, and the goods or services must form the
basis of the plaintiff’s complaint.  Houston Livestock Show & Rodeo,
Inc. v. Hamrick, 125 S.W.3d 555, 572 (Tex. App.—Austin 2003, no pet.); Bohls
v. Oakes, 75 S.W.3d 473, 479 (Tex. App.—San Antonio 2002, pet. denied); Jones
v. Star Houston, Inc., 45 S.W.3d 350, 356 (Tex. App.—Houston [1st Dist.] 2001,
no pet.).

          Rauschenberg’s petition alleges (and
the evidence shows) that he purchased the pickup from Bossier Country and had Bossier
Country’s service department perform repairs on the pickup.  Thus, he is a
“consumer” as defined by the DTPA.  See Tex. Bus. & Com. Code Ann. § 17.45(4); Houston
Livestock Show & Rodeo, 125 S.W.3d at 573; Bohls, 75 S.W.3d at
479; Jones, 45 S.W.3d at 356.  The allegations of Rauschenberg’s
petition concern the manner in which Bossier Country repaired or failed to
repair the pickup and the manner in which Bossier Country fulfilled or failed
to fulfill representations it’s employees allegedly made to Rauschenberg
regarding the pickup and Bossier Country’s service department.  Thus, the goods
and services Rauschenberg purchased from Bossier Country form the basis of his
complaint.  See Houston Livestock Show & Rodeo, 125 S.W.3d at 573; Jones,
45 S.W.3d at 356-57.  Accordingly, Rauschenberg has standing to pursue the DTPA
claims alleged in his suit.

          To have standing to sue for breach of
express or implied warranties for goods, the plaintiff must be a “buyer” of
those goods as that term is defined by the UCC.  See DaimlerChrysler Corp.
v. Inman, 121 S.W.3d 862, 882 (Tex. App.—Corpus Christi 2003, pet.
granted).[9] 
Section 2.103(a)(1) of the Business and Commerce Code (the Texas UCC) defines a
“buyer” as a “person who buys or contracts to buy goods.”  Tex. Bus. & Com. Code Ann. § 2.103(a)(1)
(Vernon Supp. 2005).  Rauschenberg’s petition alleges (and the evidence shows)
that he purchased the pickup from Bossier Country.  Thus, he has standing to
sue for breach of any express or implied warranties arising from the purchase
of the pickup.  See DaimlerChrysler Corp., 121 S.W.3d at 882.

          We apply the same rule to determine
whether a plaintiff has standing to sue for breach of the implied warranty of
good and workmanlike performance for services rendered.  Thus, such a plaintiff
must have been the one who procured the services rendered.  See
DaimlerChrysler Corp., 121 S.W.3d at 882.  Here, the petition alleges (and
the evidence shows) that Rauschenberg procured the repair services at issue
from Bossier Country.  Thus, he has standing to sue for breach of the implied
warranty of good and workmanlike performance of the services rendered.

Capacity to Sue

          The remainder of Bossier Country’s
first issue is addressed to the question of whether Rauschenberg is entitled to
recover in his individual capacity because his son and he allegedly formed a
partnership and the claims asserted in this lawsuit belong to the partnership. 
Rauschenberg denies the existence of a partnership.

          The issue of capacity to sue must be
raised by a verified pleading filed in the trial court.  Tex. R. Civ. P. 93(1), (2); Austin
Nursing Ctr., Inc. v. Lovato, 171 S.W.3d 845, 849 (Tex. 2005). 
Traditionally, this issue is raised by a verified plea in abatement.  See,
e.g., Byrd v. Est. of Nelms, 154 S.W.3d 149, 154 (Tex. App.—Waco
2004, pet. denied); M & M Constr. Co. v. Great Am. Ins. Co., 747
S.W.2d 552, 554 (Tex. App.—Corpus Christi 1988, no writ); Bluebonnet Farms,
Inc. v. Gibraltar Sav. Ass’n, 618 S.W.2d 81, 83 (Tex. Civ. App.—Houston [1st Dist.] 1980, writ ref’d n.r.e.); see also 2 Roy W. McDonald &
Elaine A. Grafton Carlson, Texas Civil Practice § 9.13 (2d ed. 2002). 
However, the issue of capacity may also be raised by a verified denial.[10] 
See Pledger v. Schoellkopf, 762 S.W.2d 145, 145-46 (Tex. 1988); McMillan
v. Dooley, 144 S.W.3d 159, 171 (Tex. App.—Eastland 2004, pet. denied); Anderson v. New Prop. Owners’ Ass’n of Newport, Inc., 122 S.W.3d 378, 383
(Tex. App.—Texarkana 2003, pet. denied).  The difference in these two
procedural mechanisms appears to lie in the manner by which the party
challenging capacity obtains a ruling from the trial court on that complaint.  See
War-Pak, Inc. v. Rice, 604 S.W.2d 498, 503 (Tex. Civ. App.—Waco 1980, writ
ref’d n.r.e.) (even though plaintiff’s capacity challenged by sworn pleading,
matter not preserved because it was never ruled on by trial court).

          If a verified plea in abatement is
filed, the filing party should seek a hearing on the plea.  If the plea is
overruled, then the matter has been preserved for appellate review.  See
War-Pak, 604 S.W.2d at 503.  If the plea is sustained however, “the trial
court should abate the case and give the plaintiff a reasonable time to cure
any defect.”  Austin Nursing Ctr., 171 S.W.3d at 853 n.7.  Should the
plaintiff fail to cure the defect, then the court may dismiss the suit with
prejudice.  See M & M Constr. Co., 747 S.W.2d at 555; 2 McDonald & Carlson, § 9.13.  

          Conversely, if a verified denial is
filed, the issue of the plaintiff’s capacity to sue is controverted, and the
plaintiff bears the burden of proving at trial that he is entitled to recover
in the capacity in which he has filed suit.  Cf. 2 McDonald & Carlson, § 9.41 (“A
properly verified denial [of an alleged partnership] imposes on the plaintiff
the burden of proving the alleged partnership”).  As the party with the burden
of proof then, it is incumbent upon the plaintiff to obtain a jury finding on
this particular issue.

          If, however, the trial court submits a
question assuming the capacity originally pleaded (e.g., a question on
what damages the plaintiff as an individual suffered because of the defendant’s
deceptive trade practices) and the defendant does not object to the question,
then the defendant is bound by that charge on appeal.  See Osterberg v. Peca,
12 S.W.3d 31, 55 (Tex. 2000); O’Connor v. Miller, 127 S.W.3d 249, 254 (Tex. App.—Waco 2003, pet. denied).  Conversely, if the defendant does object, then the
defendant will either obtain the sought-after jury finding or have an adverse
ruling which can be reviewed on appeal.

          Here, Bossier Country’s verified
denial properly controverted the issue of whether Rauschenberg is entitled to
recover in his individual capacity.  However, Bossier Country did not object to
the absence in the court’s charge of any questions, definitions, or instructions
on the issue of capacity.  Rather, Bossier Country’s trial counsel argued in
part that the jury should not award Rauschenberg any damages because his son,
if anyone, was the person who lost money as a result of the problems with the
pickup.  Bossier Country did assert in its motion for new trial that Rauschenberg
“lacked standing or capacity” to recover the damages awarded.  However, this
assertion of the issue of Rauschenberg’s capacity was not made in a timely
fashion.  See Brown v. Pittsburgh Corning Corp., 909 S.W.2d 101, 104 (Tex. App.—Houston [14th Dist.] 1995, writ denied); De La Garza v. Salazar, 851
S.W.2d 380, 383 (Tex. App.—San Antonio 1993, no writ).

          In summary, although Bossier Country
properly filed a verified denial on the issue of whether Rauschenberg is
entitled to recover in the capacity in which he sued, Bossier Country has not
preserved the issue of Rauschenberg’s capacity for appellate review because Bossier
Country did not object to the absence in the court’s charge of any questions,
definitions, or instructions on the issue of capacity.  Cf. War-Pak, 604
S.W.2d at 503.  To the extent that Bossier Country argued at trial that the
claims asserted belong to Rauschenberg’s son rather than to Rauschenberg
himself, the issue is not preserved because Bossier Country’s theory at trial was
different than the theory asserted on appeal.  See In re C.Q.T.M., 25
S.W.3d 730, 738 (Tex. App.—Waco 2000, pet. denied).  

          Because Rauschenberg has standing and
because Bossier Country has not properly preserved the issue of Rauschenberg’s
capacity, we overrule Bossier Country’s first issue.

Standards of Review

          When we conduct a no-evidence review,
we must determine “whether the evidence at trial would enable reasonable and
fair-minded people to reach the verdict under review.”  City of Keller v. Wilson, 168 S.W.3d 802, 827 (Tex. 2005).  We “must credit favorable evidence
if reasonable jurors could, and disregard contrary evidence unless reasonable
jurors could not.”  Id.

          “Under traditional factual sufficiency
standards, a court determines if a finding is so against the great weight and
preponderance of the evidence that it is manifestly unjust, shocks the
conscience, or clearly demonstrates bias.”  In re C.H., 89 S.W.3d 17, 25
(Tex. 2002).  If we conclude that the evidence is factually insufficient, we
must “detail the evidence relevant to the issue in consideration and clearly
state why the jury’s finding is factually insufficient or is so against the
great weight and preponderance as to be manifestly unjust; why it shocks the
conscience; or clearly demonstrates bias.”  Golden Eagle Archery, Inc. v. Jackson, 116 S.W.3d 757, 761 (Tex. 2003) (quoting Pool v. Ford Motor Co., 715
S.W.2d 629, 635 (Tex. 1986)).  Further, we must “state in what regard the
contrary evidence greatly outweighs the evidence in support of the verdict.”  Id.

DTPA Laundry-List Violations

          Bossier Country contends in its sixth
issue that there is no evidence or factually insufficient evidence that it
committed any of the laundry-list violations alleged.  Rauschenberg’s
allegations are that Bossier Country:

·       
represented that goods or
services were of a particular standard, quality, or grade, or that goods were
of a particular style or model, when they were of another;

 

·       
knowingly made false or
misleading statements of fact concerning the need for parts, replacement, or
repair service; and

 

·       
represented that work or
services have been performed on, or parts replaced in, goods when the work or
services were not performed or the parts replaced.

 

See
Tex. Bus. & Com. Code Ann. § 17.46(b)(7),
(13), (22).

(1) representations about promptness of
repairs—sec. 17.46(b)(7)

          Rauschenberg testified that he
explained to a Bossier Country salesperson that he needed assurances that the
pickup would be promptly repaired “if it had a breakdown” to ensure the success
of the hot-shotting business.  Several representations were made to him about Bossier
Country’s service department and the promptness of its repair work.

          The salesperson “assured [Rauschenberg]
personally,” “Oh, we’ll get it done, we’ll get it fixed, we’ll get it right
back out on the road.”

 

          When Rauschenberg asked how long
repairs usually took, he was told, “It’s according to what the problem is but
normally from one to three days.”  It was acknowledged “that you might have
some problems that would take a little longer, but ordinarily . . .”

 

Rauschenberg testified that, based on these
representations, he was led to believe “[t]hey’d get it in and get it out.”

          Rauschenberg contends that these were
actionable misrepresentations because he took the pickup to Bossier Country
three times to repair the oil leak, but it was still leaking oil even after the
third attempt to repair it.  He also notes that Bossier Country kept his pickup
more than twenty days on its third attempt to repair the oil leak.

          Bossier Country responds that these
representations are merely puffing which is not actionable under section
17.46(b)(7).  Bossier Country is correct that “mere puffing” is not actionable
under this provision.  Helena Chem. Co. v. Wilkins, 47 S.W.3d 486, 502 (Tex. 2001); Humble Nat’l Bank v. DCV, Inc., 933 S.W.2d 224, 229 (Tex. App.—Houston [14th Dist.] 1996, writ denied); Hedley Feedlot, Inc. v. Weatherly Trust,
855 S.W.2d 826, 838-39 (Tex. App.—Amarillo 1993, writ denied); see also
Munters Corp. v. Swissco-Young Indus., Inc., 100 S.W.3d 292, 298 (Tex.
App.—Houston [1st Dist.] 2002, pet. dism’d) (puffing not actionable under
section 17.46(b)(5)).

          Three factors are considered in
determining whether a representation is “mere puffing”: (1) the specificity of
the representation; (2) the comparative knowledge of the buyer and seller; and
(3) whether the representation relates to a future event or condition.  Munters
Corp., 100 S.W.3d at 298; Humble Nat’l Bank, 933 S.W.2d at 230; Hedley
Feedlot, 855 S.W.2d at 839; Autohaus, Inc. v. Aguilar, 794 S.W.2d 459,
462-64 (Tex. App.—Dallas 1990), writ denied, 800 S.W.2d 853 (Tex. 1991)
(per curiam).

          A review of these particular
representations convinces us that they are too general to be actionable.  None
of the statements guarantees a precise timeframe for completion of repairs. In
fact, the last statement acknowledges that some problems take longer to repair
than the “one to three days” “normally” required.  This acknowledgement renders
the statements too indefinite to be actionable.  See Bradford v. Vento,
48 S.W.3d 749, 759 (Tex. 2001); Autohaus, 794 S.W.2d at 464-65.

          Because these statements are too
indefinite to be actionable, we hold that there is no evidence in the record
which “would enable reasonable and fair-minded people” to find that Bossier
Country made a misrepresentation under section 17.46(b)(7).  Wilson, 168
S.W.3d at 827.

 

 

(2) representations about need for repairs—sec.
17.46(b)(13)

          Rauschenberg contends that, because he
took the pickup to Bossier Country three times to repair the oil leak and
because Bossier Country tried but failed to repair the leak on each occasion, Bossier
Country necessarily “made false or misleading statements of fact concerning the
need for parts, replacement, or repair service.”

          On the first occasion, Bossier Country
determined that the turbocharger was the cause of the oil leak.  In addition, Bossier
Country repaired the clutch in response to Rauschenberg’s complaint.  Rauschenberg
does not contend (and there is no evidence to suggest) that either of these
repairs was unnecessary.

          On the second occasion, Bossier
Country recommended that the injector pump be replaced and the fuel system
flushed to make the engine run smoothly and at full power.  Bossier Country
concluded that the breather trap needed cleaning to resolve the problem with
oil on the front of the engine.  Rauschenberg does not contend (and there is no
evidence to suggest) that any of these repairs was unnecessary.

          On the last occasion, Bossier Country
again recommended that the fuel system be flushed and this time recommended
that the front engine seal be replaced to stop the oil leak.  Bossier Country
replaced the seal, then tested the engine for oil leaks and found none. 
However, Rauschenberg did not retrieve the pickup until more than five months
later.  Again, Rauschenberg does not contend (and there is no evidence to
suggest) that any of these repairs was unnecessary.

          The Killeen dealership determined that
the pickup was leaking oil because of a cracked timing cover housing.  The
dealership repaired this problem, but Rauschenberg nevertheless had to return
the pickup a few days later because the engine continued to leak oil.  The Killeen dealership identified two additional places where the engine was leaking oil and
repaired them.  Apparently, this finally put an end to the oil leaks.

          Rauschenberg essentially contends
that, because Bossier Country recommended three separate courses of action to
repair the oil leak and because the pickup continued to leak oil after these
repairs were made, none of the three recommended repairs was needed.  However,
we cannot agree that the fact that the recommended repairs did not finally
resolve the oil-leak problem inevitably leads to the conclusion that any of the
recommended repairs was unnecessary.

          Rauschenberg presented no expert (or
lay) testimony regarding the necessity of any of the repairs Bossier Country
performed.  Cf. Daugherty v. Jacobs, 187 S.W.3d 607, 614-15 (Tex. App.—Houston [14th Dist.] 2006, no pet.) (plaintiff offered expert testimony to
support DTPA claim regarding auto repairs).

          Accordingly, we hold that there is no
evidence in the record which “would enable reasonable and fair-minded people”
to find that Bossier Country made a misrepresentation under section
17.46(b)(13).  Wilson, 168 S.W.3d at 827.

(3) representations that services were
performed—sec. 17.46(b)(22)

          Rauschenberg contends that, because he
took the pickup to Bossier Country three times to repair the oil leak and
because Bossier Country tried but failed to repair the leak on each occasion, Bossier
Country necessarily represented that services had been performed when those
services had not been performed.

          Bossier Country told Rauschenberg on
each of the three occasions what repairs it believed were necessary to fix the
oil leak.  Bossier Country performed the repairs that it told Rauschenberg it
would perform.  Rauschenberg testified that, on the last occasion at least,
someone from Bossier Country told him that the oil leak had been fixed.  When
he retrieved the pickup however, he found that it was still leaking oil.

          From this evidence, we conclude that
“reasonable and fair-minded people” could conclude that Bossier Country had
represented to Rauschenberg that it had fixed the oil leak when it had in fact
not done so.  See Padgett v. Bert Ogden Motors, Inc., 869 S.W.2d 532,
536 (Tex. App.—Corpus Christi 1993, writ denied).  Thus, the record contains
some evidence to support the jury’s finding on this issue.  See Wilson, 168 S.W.3d at 827.

          When Rauschenberg retrieved the pickup
in early July, a Bossier Country employee told him that the oil leak was
fixed.  However, he documented almost immediately that he was having to add
several quarts of oil whenever he used the pickup.  Bossier Country construes
this as evidence that the pickup was “using oil after he picked it up,
not that it was leaking oil.”  However, Rauschenberg also testified that
on one of the trips he took after retrieving the pickup his white trailer
turned black because of the oil that was leaking from the engine.  Rauschenberg
also directly testified that the pickup continued to leak oil after he
retrieved it in July.

          Finally, Bossier Country notes that Rauschenberg
did not include an “oil leak” as one of the bases for his lemon-law complaint.

          Although Bossier Country has
identified some evidence Bossier Countrywhich
is contrary to the jury’s finding on this issue, we cannot say that this “finding
is so against the great weight and preponderance of the evidence that it is
manifestly unjust, shocks the conscience, or clearly demonstrates bias.”  See
C.H., 89 S.W.3d at 25.  Accordingly, we conclude that the evidence is
factually sufficient to support a finding that Bossier Country represented that
it had repaired the oil leak when it had in fact not done so.

          Nevertheless, Bossier Country contends
that, because there is no evidence to support two of the three DTPA theories of
liability submitted to the jury in a single question, this Court must reverse
the finding of liability under the DTPA because it cannot be determined whether
the verdict was based on the theory supported by the evidence or on one of the
theories without evidentiary support.  See Crown Life Ins., 22 S.W.3d at
389.

          In Crown Life Insurance, the
Supreme Court held:

          When a single broad-form liability
question erroneously commingles valid and invalid liability theories and the
appellant’s objection is timely and specific, the error is harmful when it
cannot be determined whether the improperly submitted theories formed the sole
basis for the jury’s finding.

 

Id.
(emphasis added).

          Because Bossier Country did not object
to the question in the charge which submitted these three theories of liability
to the jury, we must uphold the jury’s finding if there is some evidence and
factually sufficient evidence to support any of the theories submitted in the
question.[11]  See
In re A.V., 113 S.W.3d 355, 363 (Tex. 2003).

          We have determined that there is some
evidence and factually sufficient evidence to support a finding that Bossier
Country represented that it had repaired the oil leak when it had in fact not done
so.  Accordingly, we overrule Bossier Country’s sixth issue.

Disclaimer Warranties

          Bossier Country contends in its seventh
issue that a disclaimer in the sales contract for the pickup (and similar
disclaimers in each of the repair invoices) precludes Rauschenberg from
recovering for breach of any implied or express warranty.

          The trial court submitted a single
question to the jury on Rauschenberg’s warranty claims, inquiring whether Bossier
Country breached an express warranty or the implied warranty of good and
workmanlike performance.[12] 
First, we determine the sources of the alleged warranties.

          The implied warranty of good and
workmanlike performance finds its genesis in caselaw and was first recognized
by the Supreme Court in Melody Home Manufacturing Co. v. Barnes.  741
S.W.2d 349, 354 (Tex. 1987).  Conversely, the express warranty at issue in this
case arises from the statements of Bossier Country representatives about the promptness
of repairs done by Bossier Country’s service department and/or from the
extended service contract which Rauschenberg purchased when he bought the
pickup.[13]

          The implied warranty of good and workmanlike
performance cannot “be waived or disclaimed.”  Id. at 355; accord
Centex Homes v. Buecher, 95 S.W.3d 266, 270 (Tex. 2002).[14]

Conversely, an express oral warranty in
connection with the sale of goods is not enforceable unless it “becomes part of
the basis of the bargain.”  See Tex.
Bus. & Com. Code Ann. § 2.313(a)(1) (Vernon 1994); Balderson-Berger
Equip. Co. v. Blount, 653 S.W.2d 902, 908 (Tex. App.—Amarillo 1983, no
writ).  If the parties reduce their agreement to writing, a merger clause in
that agreement providing that no prior representations are enforceable against
the seller unless expressly included within the written contract or other
writing and approved by an authorized representative of the seller will render
any prior oral representations unenforceable absent proof of fraud, accident,
or mistake.  See Balderson-Berger Equip. Co., 653 S.W.2d at 908; accord
McCrea v. Cubilla Condominium Corp., 685 S.W.2d 755, 757-58 (Tex.
App.—Houston [1st Dist.] 1985, writ ref’d n.r.e.) (holding that such a merger
clause operated to waive alleged express warranty).

          Here, an “addendum” to the sales
contract between Rauschenberg and Bossier Country provides in pertinent part:

                   Buyer acknowledges and
understands that any oral agreement not reduced to writing will not be binding
upon the dealership.  If buyer desires such agreement to be reduced to writing,
then this must be indicated at the time of the sale.  Any written agreement
must be approved by an authorized manager of this dealership.

 

          Because of this clause and because Rauschenberg
has produced no writing containing the alleged oral warranties and approved by
an authorized manager of Bossier Country, the alleged oral warranties are
unenforceable.  See Balderson-Berger Equip. Co., 653 S.W.2d at 908; see
also McCrea, 685 S.W.2d at 757-58.

          To the extent Rauschenberg’s breach of
warranty claim is based on an alleged breach of the extended service contract (i.e.,
“extended warranty”) he purchased when he bought the pickup, neither the
addendum to the sales contract nor the disclaimers contained in each of the
repair invoices) can be construed as disclaiming the extended warranty
coverage.

          Section[15]
2.316(a) provides:

                    Words or conduct relevant to
the creation of an express warranty and words or conduct tending to negate or
limit warranty shall be construed wherever reasonable as consistent with each
other; but subject to the provisions of this chapter on parol or extrinsic
evidence (Section 2.202) negation or limitation is inoperative to the extent
that such construction is unreasonable.

 

Tex. Bus. & Com.
Code Ann. § 2.316(a) (Vernon 1994).  As comment 1 explains:

                    This section is designed
principally to deal with those frequent clauses in sales contracts which seek
to exclude “all warranties, express or implied.”  It seeks to protect a buyer
from unexpected and unbargained language of disclaimer by denying effect to
such language when inconsistent with language of express warranty and
permitting the exclusion of implied warranties only by conspicuous language or
other circumstances which protect the buyer from surprise.

 

Id.
cmt. 1.

          Here application of the disclaimers
relied on by Bossier Country to preclude enforcement of the extended warranty
coverage would be inconsistent with the extended coverage for which Rauschenberg
negotiated and paid.  Thus, the disclaimers are inoperative to the extent they
conflict with the extended warranty.  See Mercedes Benz of N. Am., Inc. v.
Dickenson, 720 S.W.2d 844, 852 (Tex. App.—Fort Worth 1986, no writ).

          Accordingly, we sustain Bossier
Country’s seventh issue in part and overrule it in part.




Breach of Warranty

          Bossier Country contends in its eighth
issue that there is no evidence or factually insufficient evidence that it
breached the implied warranty of good and workmanlike performance or the express
warranty provided by the extended service contract.

          The Supreme Court has defined good and
workmanlike performance “as that quality of work performed by one who has the
knowledge, training, or experience necessary for the successful practice of a
trade or occupation and performed in a manner generally considered proficient
by those capable of judging such work.”  Melody Home, 741 S.W.2d at 354.

          The implied warranty of good and
workmanlike performance in the repair of goods does “not require repairmen to
guarantee the results of their work.”  Id. at 355.  Rather, this
implied warranty requires only that those who repair goods “perform
those services in a good and workmanlike manner.”  Id.

          In Melody Home, the breach at
issue was self-evident.

                   In this case, the breach of
the implied warranty was plainly within the common knowledge of laymen and did
not require expert testimony.  The jurors had sufficient knowledge to find that
the failure to connect a washing machine drain would not be considered good and
workmanlike by those capable of judging repair work.

 

Id. 
We cannot say the same for the breach of implied warranty alleged by Rauschenberg.

          The only testimony in the record by a
person arguably qualified to discuss what is “generally considered proficient”
in the field of auto mechanics is from Bossier Country’s service manager. 
However, the service manager only authenticated the Bossier Country records
offered in evidence and testified about what repairs were performed.  The
service manager did not characterize the repairs at issue as having been “performed
in a manner generally considered proficient” or as having not been performed in
such a manner.

          The only evidence before the jury on
this issue which would arguably support a finding that Bossier Country breached
this implied warranty is that the service department at the Killeen dealership
was apparently able to diagnose and fully repair the oil leak in two relatively
brief attempts.

          However, absent expert testimony
regarding what is “generally considered proficient” in the field of auto
mechanics, it was beyond the purview of the jury to second-guess the Bossier
Country service department.  Cf. Daugherty, 187 S.W.3d at 614-15.  The
evidence presented was that Bossier Country consulted with the engine
manufacturer on each occasion regarding the appropriate repairs and followed
the manufacturer’s recommendations.  On the last repair, after replacing the
front engine seal, Bossier Country retested the engine to be sure it was not
leaking oil.

          Plainly, Rauschenberg is dissatisfied
with the results of the repairs performed by the Bossier Country service
department.  However, merely because Bossier Country was not able to fix the
oil leak does not mean that it failed to perform the requested repairs in a
good and workmanlike manner.  Unlike the repairs in Melody Home, the
repairs at issue here are not “plainly within the common knowledge of laymen.” 
Cf. Melody Home, 741 S.W.2d at 355.  Accordingly, we cannot say that the
record contains evidence which “would enable reasonable and fair-minded people”
to conclude that Bossier Country breached an implied warranty of good and
workmanlike performance.  See Wilson, 168 S.W.3d at 827.

          Rauschenberg also contends that Bossier
Country breached the express warranty provided by the extended service contract. 
To prevail on such a claim, Rauschenberg must establish the existence of the
express warranty, that the warranty was breached, and that he suffered injury
as a result.  See U.S. Tire-Tech, Inc. v. Boeran, B.V., 110 S.W.3d 194,
197 (Tex. App.—Houston [1st Dist.] 2003, pet. denied); see also Crosbyton
Seed Co. v. Mechura Farms, 875 S.W.2dBossier
CountryBossier CountryBossier Country

 353, 361 (Tex. App.—Corpus Christi 1994, no
writ) (“to recover for breach of an express warranty, a plaintiff must prove
that the affirmation or description was made, that it was part of the basis of
the bargain, that the buyer relied on the statements, that the goods failed to
comply with the affirmation, that the buyer was financially injured, and that
the breached affirmation was a proximate cause of the injury”).

          It has been said that “[a]n express
warranty is entirely a matter of contract.”  Cravens v. Skinner, 626
S.W.2d 173, 176 (Tex. App.—Fort Worth 1981, no writ) (quoting Donelson v.
Fairmont Foods Co., 252 S.W.2d 796, 799 (Tex. Civ. App.—Waco 1952, writ
ref’d n.r.e.)).  Thus, to prove the breach of an express warranty, the
plaintiff must present proof of the terms of the express warranty and proof
that one or more of those terms has been breached.  See Songer v. Archer,
23 S.W.3d 139, 142 (Tex. App.—Texarkana 2000, no pet.); TCI Cablevision of Tex., Inc. v. S. Tex. Cable Television, Inc., 791 S.W.2d 269, 271 (Tex. App.—Corpus
Christi 1990, writ denied).

          Here, the evidence reflects that Rauschenberg
purchased an extended service contract which extended the warranty on the
pickup.  However, the record is silent as to the terms of that warranty.  All
that can be said with certainty is that the warranty coverage for the pickup’s
diesel engine lasts for 60 months or 100,000 miles, whichever occurs first. 
Presumably, the warranty covers repairs for the specified period.  See Black’s Law Dictionary 1619 (8th ed.
2004).[16]

          There is no evidence in the record
which “would enable reasonable and fair-minded people” to conclude that Bossier
Country breached its express warranty to provide repairs on Rauschenberg’s
pickup.  See Wilson, 168 S.W.3d at 827.

          Accordingly, we sustain Bossier
Country’s eighth issue.

Knowing or Intentional Conduct

          Bossier Country contends in its ninth
and tenth issues respectively that there is no evidence or factually
insufficient evidence that it acted knowingly or intentionally when it
represented that it had repaired the oil leak even though it had not.  In its
eleventh issue, Bossier Country contends that because there is no evidence of a
knowing or intentional misrepresentation, the additional damages award cannot
stand.

          Section 17.45 defines the terms
“knowingly” and “intentionally” for purposes of the DTPA.

                   “Knowingly” means actual
awareness, at the time of the act or practice complained of, of the falsity,
deception, or unfairness of the act or practice giving rise to the consumer’s
claim or, in an action brought under Subdivision (2) of Subsection (a) of
Section 17.50, actual awareness of the act, practice, condition, defect, or
failure constituting the breach of warranty, but actual awareness may be
inferred where objective manifestations indicate that a person acted with actual
awareness.

 

Tex. Bus. & Com.
Code Ann. § 17.45(9) (Vernon 2002).

 

                   “Intentionally” means actual
awareness of the falsity, deception, or unfairness of the act or practice, or
the condition, defect, or failure constituting a breach of warranty giving rise
to the consumer’s claim, coupled with the specific intent that the consumer act
in detrimental reliance on the falsity or deception or in detrimental ignorance
of the unfairness.  Intention may be inferred from objective manifestations
that indicate that the person acted intentionally or from facts showing that a
defendant acted with flagrant disregard of prudent and fair business practices
to the extent that the defendant should be treated as having acted
intentionally.

 

Id.
§ 17.45(13) (Vernon 2002).

          The Supreme Court has clarified the
term “actual awareness” as used in these definitions.

          “Actual awareness” does not mean
merely that a person knows what he is doing;  rather, it means that a person
knows that what he is doing is false, deceptive, or unfair.  In other words, a
person must think to himself at some point, “Yes, I know this is false,
deceptive, or unfair to him, but I’m going to do it anyway.”

 

St. Paul Surplus Lines Ins. Co. v. Dal-Worth Tank Co., 974 S.W.2d 51, 53-54 (Tex. 1998).  The Court
further explained that “knowingly,” “intentionally,” and other culpable mental
states “lie on a continuum with gross negligence being the lowest mental state
and intentional being the highest.”  Id. (quoting Luna v. N. Star
Dodge Sales, Inc., 667 S.W.2d 115, 118 (Tex. 1984)); accord Comsys Info.
Tech. Servs., Inc. v. Twin City Fire Ins. Co., 130 S.W.3d 181, 197 (Tex. App.—Houston [14th Dist.] 2003, pet. denied).

          Here, Rauschenberg claims that Bossier
Country acted knowingly because Bossier Country “did not even attempt to fix
the oil leak” on two of the three occasions he sought to have it fixed. 
However, the record does not support this characterization of Bossier Country’s
conduct.  The record reflects that, on the first occasion, Bossier Country (in
consultation with the manufacturer) determined that the turbocharger was the
source of the oil leak and replaced it.  On the second occasion, it was
determined that the breather trap needed to be cleaned to stop the oil leak. 
Admittedly, there is no evidence in the record that this was done.  On the last
occasion, it was determined that the front engine seal was the source of the
leak, and this seal was replaced.  Bossier Country tested the engine after
replacing the seal and determined that it was no longer leaking oil.

          In addressing Rauschenberg’s
laundry-list allegations, we have concluded that the evidence supports only a
finding that Bossier Country represented that it had repaired the oil leak in
January 2001 even though it had not. Therefore, even assuming Bossier Country
failed to clean the breather trap as recommended on Rauschenberg’s second visit
in December 2000, we find no evidence in the record which “would enable
reasonable and fair-minded people” to conclude that Bossier Country “knowingly”
misrepresented in January 2001 that it had repaired the oil leak.  See St. Paul Surplus Lines Ins. Co., 974 S.W.2d at 53-54; cf. K.C. Roofing Co. v.
Abundis, 940 S.W.2d 375, 377 (Tex. App.—San Antonio 1997, writ denied)
(knowing conduct found where contractor admitted work was not done properly but
did not fix it even though he continued to bill plaintiff for balance owed); Star
Houston, Inc. v. Kundak, 843 S.W.2d 294, 300 (Tex. App.—Houston [14th
Dist.] 1992, no writ) (knowing conduct found where evidence showed that “resort
to readily available reference materials and technical advice from Mercedes
would have led to quick resolution of the problems”); Jeep Eagle Sales Corp.
v. Mack Massey Motors, Inc., 814 S.W.2d 167, 175 (Tex. App.—El Paso 1991,
writ denied) (knowing conduct found where sales manager misrepresented that
vehicle was suitable for towing Airstream trailer, dealer refused to honor
promise of free oil change, dealer refused to continue servicing vehicle, and
manufacturer denied warranty claim).

          Because there is no evidence that Bossier
Country “knowingly” made an actionable misrepresentation, there is necessarily
no evidence that Bossier Country “intentionally” made such a
misrepresentation.  See Tex. Bus.
& Com. Code Ann. § 17.45(13); St. Paul Surplus Lines Ins.
Co., 974 S.W.2d at 54; Comsys Info. Tech. Servs., 130 S.W.3d at
197.  Because there is no evidence that Bossier Country acted knowingly or
intentionally, the jury’s award of additional damages cannot stand.  See
Tex. Bus. & Com. Code Ann. § 17.50(b)(1)
(Vernon Supp. 2005).

          Accordingly, we sustain Bossier
Country’s ninth, tenth, and eleventh issues.

Lost Profits

          Bossier Country contends in its second
issue that there is no evidence or factually insufficient evidence to support
the jury’s award of $5,000 for lost profits.

          “Lost profits are damages for the loss
of net income to a business measured by reasonable certainty.”  Miga v.
Jensen, 96 S.W.3d 207, 213 (Tex. 2002); accord Texaco, Inc. v. Phan,
137 S.W.3d 763, 771 (Tex. App.—Houston [1st Dist.] 2004, no pet.); Atlas
Copco Tools, Inc. v. Air Power Tool & Hoist, Inc., 131 S.W.3d 203, 209
(Tex. App.—Fort Worth 2004, pet. denied).  Net income is “what remains in the
conduct of business after deducting from its total receipts all of the expenses
incurred in carrying on the business.”  Atlas Copco Tools, 131 S.W.3d at
209 (quoting Turner v. PV Int’l Corp., 765 S.W.2d 455, 465 (Tex.
App.—Dallas 1988), writ denied, 778 S.W.2d 865 (Tex. 1989) (per
curiam)); accord Texaco, 137 S.W.3d at 771.

          Here, Rauschenberg’s son Kelly
testified that the hot-shotting business derived its primary income hauling
cargo for Jerry’s Auto Services.  Kelly explained that Jerry’s Auto charged
each customer a fee based on the mileage traveled for the delivery and also a
fuel surcharge of 10 cents per mile for each delivery.[17] 
Kelly testified that Jerry’s Auto then paid him about 77% of the invoice total
for each custormer.  The fuel surcharge roughly equated the cost of fuel for
the delivery.  Not including the fuel surcharge, Kelly calculated that he had
income of about $3,332 per month for June, July, and August 2000.

          Based on this evidence, Rauschenberg
asked the jury to award him $13,000 in lost profits, which represents $1,666
per month (because Kelly and he had agreed to split the receipts from the
hot-shotting business) for eight months (December 2000 through July 2001).[18] 
However, the jury awarded only $5,000 in lost profits.

          Bossier Country contends that there is
no evidence to support this award because Rauschenberg failed to account for
“all of the expenses” incurred in the hot-shotting business.  See Texaco,
137 S.W.3d at 771; Atlas Copco Tools, 131 S.W.3d at 209; Turner,
765 S.W.2d at 465.  We agree.

          A plaintiff need not provide “exact
calculations” to recover for lost profits.  Helena Chem. Co., 47 S.W.3d at
504.  “At a minimum [however], opinions or lost-profit estimates must be based
on objective facts, figures, or data from which the lost-profits amount may be
ascertained.”  Id.

          Here, Rauschenberg did not account for
all the expenses incurred in the hot-shotting business.  Thus, he failed to
provide sufficient “facts, figures, or data” from which the jury could
ascertain lost net profits.  See Texaco, 137 S.W.3d at 771-73; Atlas
Copco Tools, 131 S.W.3d at 209.  Accordingly, we sustain Bossier Country’s
second issue.

 

 

Loss of Use

          Bossier Country contends in its third
issue that there is no evidence or factually insufficient evidence to support
the jury’s award of $2,100 as the reasonable value for the loss of use of the
pickup because Rauschenberg provided no evidence about the reasonable rental
value of a substitute pickup.

          Proof of the reasonable rental value
of a substitute vehicle is the usual measure for proving up loss of use.  See
Luna, 667 S.W.2d at 119; Goose Creek Consol. Indep. Sch. Dist. v.
Jarrar’s Plumbing, Inc., 74 S.W.3d 486, 497 (Tex. App.—Texarkana 2002, pet.
denied).  However, this is not the sole measure for proving up loss of use.  See,
e.g., Goose Creek, 74 S.W.3d at 498; Amelia’s Automotive, Inc. v.
Rodriguez, 921 S.W.2d 767, 771 (Tex. App.—San Antonio 1996, no writ); Chem.
Express Carriers, Inc. v. French, 759 S.W.2d 683, 687-88 (Tex. App.—Corpus
Christi 1988, writ denied); Town East Ford Sales, Inc. v. Gray, 730
S.W.2d 796, 804-05 (Tex. App.—Dallas 1987, no writ).

          In Goose Creek, the court
approved a school district’s use of a modified diminution of value calculation
as an appropriate basis to measure loss of use for school buildings.  74 S.W.3d
at 498-99.  In Amelia’s Automotive and Chemical Express Carriers,
the courts approved lost profits as an appropriate measure for loss of use
because the plaintiffs in those cases lost the opportunity to accrue earnings
because of the loss of use of a truck in one case and an airplane in the other. 
See Amelia’s Automotive, 921 S.W.2d at 771-72; Chem. Express Carriers,
759 S.W.2d at 687-88.  In Town East Ford, the plaintiff was permitted to
use replacement cost (down payment, taxes and fees, and monthly payment) as a
measure for loss of use because the cost for a replacement car was
significantly less than the monthly rental would be.  730 S.W.2d at 804-05.

          Here, Rauschenberg testified that he
did not know where he could rent a pickup comparable to the one he had
purchased from Bossier Country.  Proof of the reasonable rental value of a
substitute vehicle is not the exclusive measure for proving up loss of use.  See
Goose Creek, 74 S.W.3d at 498; Amelia’s Automotive, 921 S.W.2d at
771; Chem. Express Carriers, 759 S.W.2d at 687-88; Town East Ford,
730 S.W.2d at 804-05.

          We have already concluded that Rauschenberg
did not prove up his lost profits.  However, Rauschenberg did prove the monthly
payment for the pickup, $698.65.  This is plainly evidence of what it cost Rauschenberg
to use the pickup on a monthly basis.  Cf. Town East Ford,
730 S.W.2d at 804-05.  Thus, we hold that this is an appropriate measure for
determining the value for the loss of use of the pickup.

          Nevertheless, Rauschenberg is only
entitled to be compensated for the period of time he was denied use of the
pickup because of Bossier Country’s misconduct.  See Tex. Bus. & Com. Code Ann. § 17.50(a)
(Vernon Supp. 2005) (plaintiff entitled to recover damages for which DTPA
violation was producing cause).  In addition, a DTPA plaintiff has a duty to
mitigate damages.  Gunn Infiniti, Inc. v. O’Byrne, 996 S.W.2d 854, 858 (Tex. 1999).

          Therefore, Rauschenberg’s potential
period of compensation for Bossier Country’s misrepresentation began at the
earliest when Bossier Country made the misrepresentation in January about
having repaired the pickup.  However, Rauschenberg did not retrieve the pickup
from Bossier Country until July 2.  He cannot recover damages for loss of use
of the pickup during this period because he voluntarily chose to not retrieve
it.  See id.

          Rauschenberg testified that, after he
retrieved the pickup on July 2, the pickup continued to leak oil and not run
well.  He took the pickup to the Killeen dealership for repair on July 24.  It
was not ultimately repaired until August 3.

          Therefore, Rauschenberg provided
evidence of loss of use from July 2 through August 3, a total of thirty-three
days inclusive of the beginning and ending dates.  Bossier Country suggests
that a per diem rate of $23.28 may be applied if it is determined that the
monthly payment is an appropriate measure for loss of use damages.[19] 
We accept Bossier Country’s suggestion and apply this per diem rate to the
thirty-three days for which Rauschenberg has shown himself entitled to loss of
use damages.  The resulting amount is $768.24.

          Accordingly, we sustain Bossier
Country’s third issue in part.  Because we have determined that the evidence is
factually insufficient to support the jury’s award of loss of use damages, we
will suggest a remittitur of $1,331.76.  See Tex. R. App. P. 46.3; Torrington Co. v. Stutzman, 46
S.W.3d 829, 851 (Tex. 2000); Burke v. Union Pac. Res. Co., 138 S.W.3d 46,
72 (Tex. App.—Texarkana 2004, pet. denied).

Reasonable Value of Time

          Bossier Country contends in its fourth
issue that there is no evidence or factually insufficient evidence to support
the jury’s award of $1,000 as compensation for the reasonable value of Rauschenberg’s
time spent attempting to correct problems with the repair of the pickup.

          Under section 17.50(a), a DTPA plaintiff
may recover “economic damages” for which the defendant’s misconduct was a
producing cause.  Tex. Bus. & Com.
Code Ann. § 17.50(a).  The term “economic damages” has been construed to
include “the total loss sustained [by the consumer] as a result of the
deceptive trade practice” which “includ[es] related and reasonably necessary
expenses.”  Manon v. Tejas Toyota, Inc., 162 S.W.3d 743, 754 (Tex. App.—Houston [14th Dist.] 2005, no pet.) (quoting Henry S. Miller Co. v. Bynum,
836 S.W.2d 160, 162 (Tex. 1992)); accord Matheus v. Sasser, 164 S.W.3d 453,
459-60 (Tex. App.—Fort Worth 2005, no pet.).

          Bossier Country does not contend that Rauschenberg
is not entitled to be compensated for the reasonable value of his time spent
attempting to correct problems with the repair of the pickup.  Rather, it
contends that, because he used his daily pay ($250) to calculate this element
of his damages, he should receive this compensation only for days he had to
miss work.  We agree.

          On cross-examination, Rauschenberg testified
that he had to drive to Bossier Country four times in his attempts to resolve
the problems with the repair of the pickup.[20] 
However, he conceded that one of these visits occurred on Saturday, when he did
not work.  Accordingly, the evidence supports only $750 in damages for the
reasonable value of his time.

          Therefore, we sustain Bossier Country’s
fourth issue in part.  Because we have determined that the evidence is
factually insufficient to support the jury’s award of damages for the
reasonable value of Rauschenberg’s time, we will suggest a remittitur of $250. 
See Tex. R. App. P. 46.3; Torrington
Co., 46 S.W.3d at 851; Burke, 138 S.W.3d at 72.

 

 

Travel Expenses

          Bossier Country contends in its fifth
issue that there is no evidence or factually insufficient evidence to support
the jury’s award of $312 for what was designated in the charge as “out-of-pocket
expenses.”  Based on Rauschenberg’s testimony and argument of counsel, this
award appears to be based on mileage compensation Rauschenberg testified he
should receive.

          Travel expenses may be awarded as
economic damages in a DTPA suit.  See Dillon v. Troublefield, 601 S.W.2d
141, 143 (Tex. Civ. App.—Austin 1980, no writ); see also Henry S. Miller Co.,
836 S.W.2d at 162; Matheus, 164 S.W.3d at 459-60; Manon, 162
S.W.3d at 754.

          Rauschenberg testified that employees
at his place of business are paid 30 cents per mile when traveling on company
business.  He asked the jury to award him 30 cents per mile for the trips he
made to Bossier Country relating to the repair of the pickup.  He testified
that it is 208 miles from his home to Bossier Country.  Apparently, the jury
decided to compensate him for five trips to Bossier Country.[21]

          As with compensation for loss of time,
Bossier Country does not contend that 30 cents is an inappropriate measure. 
Rather, it challenges the number of trips for which Rauschenberg is entitled to
compensation.  We agree.

          As stated in the discussion of Rauschenberg’s
fourth issue, Rauschenberg testified on cross-examination that he made four
trips to Bossier Country.  Accordingly, we sustain Bossier Country’s fifth
issue in part.  Because we have determined that the evidence is factually
insufficient to support the jury’s award of damages for travel expenses, we
will suggest a remittitur of $62.  See Tex.
R. App. P. 46.3; Torrington Co., 46 S.W.3d at 851; Burke,
138 S.W.3d at 72.

Attorney’s Fees

          Bossier Country contends in its
twelfth issue that Rauschenberg is not entitled to attorney’s fees because he
failed to prove the alleged DTPA violations.  Bossier Country contends in its
thirteenth issue that the attorney’s fee award must be modified because there
is no evidence or factually insufficient evidence to prove all or part of the
damages awarded.

          Under the DTPA, “[e]ach consumer who
prevails shall be awarded court costs and reasonable and necessary attorneys’
fees.”  Tex. Bus. & Com. Code Ann.
§ 17.50(d) (Vernon Supp. 2005).  Thus, the award of reasonable and necessary
attorney’s fees is mandatory for a prevailing DTPA plaintiff.  Continental
Dredging, Inc. v. De-Kaizered, Inc., 120 S.W.3d 380, 396 (Tex.
App.—Texarkana 2003, pet. denied).  We have determined that Rauschenberg is
entitled to prevail on one of his allegations that Bossier Country violated the
DTPA.

          Nevertheless, Bossier Country contends
that the attorney’s fee award must be recalculated because it is no longer
reasonable in light of the modifications we have made to the damages award.  Bossier
Country cites Arthur Andersen & Co. v. Perry Equipment Corp. to support
its assertion that the result obtained in a lawsuit is a factor to be
considered in determining the reasonableness of an attorney’s fee award.  945
S.W.2d 812, 818 (Tex. 1997).

          We agree that the result of the
litigation is a factor.  However, it is only part of one of the eight factors
listed for consideration in Arthur Andersen.[22] 
See id.  Thus, we decline to reverse the attorney’s fee award solely
because a remittitur has been suggested.

          Rauschenberg proved that Bossier
Country committed a violation of the DTPA.  His attorney testified to the
amount of reasonable and necessary attorney’s fees incurred.  Accordingly, we
overrule Bossier Country’s twelfth and thirteenth issues.

Conclusion

          We affirm the judgment insofar as it
recites a finding that Bossier Country committed a “False, Misleading, or
Deceptive Act or Practice” and insofar as it awards Rauschenberg reasonable and
necessary attorney’s fees for trial and in the event of an appeal.

          We reverse the judgment insofar as it
recites findings that Bossier Country “Fail[ed] to Comply With a Warranty” and
acted “Knowingly and Intentionally” and render judgment that Rauschenberg take
nothing on these claims and on his related claim for additional damages under
the DTPA.  We likewise reverse the judgment on Rauschenberg’s claim for lost
profits and render judgment that Rauschenberg take nothing on this element of his
damages claim.[23]

Because the evidence is factually insufficient
to support the remainder of the jury’s award for “actual and/or economic damages,”
we suggest a remittitur of $1,643.76.  Therefore, if Rauschenberg files a
remittitur of $1,643.76 with the Clerk of this Court within twenty-one (21)
days after the date of this opinion, we will modify the trial court’s judgment
to award “actual and/or economic damages” of $1,768.24, plus attorneys fee’s
and costs and post-judgment interest as ordered by the trial court.

However, if Rauschenberg fails to make the
suggested remittitur, we will reverse the judgment and remand this cause for a
new trial on liability and damages.  See Tex. R. App. P. 44.1(b); Estrada v. Dillon, 44 S.W.3d 558,
562 (Tex. 2001) (per curiam).

 

FELIPE REYNA

Justice

Before Chief Justice
Gray,

Justice
Vance, and

Justice
Reyna

          (“Chief Justice Gray dissents, noting
there are many statements in the opinion with which I cannot agree but I
dissent from the judgment based upon the Court’s award of attorney fees for the
appeal to the party losing the appeal.  While Mr. Rauschenberg held onto a
meager recovery, there is no way to view the result as anything other than a
loss for Mr. Rauschenberg.  Accordingly, I would not affirm the trial court’s
award of attorney fees on appeal.  Given the substantial reduction in Rauschenberg’s
recovery, I would also suggest a remittitur in the attorney fee for trial
award.”)

Affirmed in part, Reversed
and Rendered in part

          Remittitur
suggested

Opinion delivered and
filed June 14, 2006

[CV06]









[1]
          The pickup came with a 3
month/3,000 mile limited warranty.  The extended service contract provided
additional coverage of 60 months/50,000 miles for the emissions system and 60
months/100,000 miles for corrosion perforation and for the diesel engine.

 





[2]
          Rauschenberg bought the truck
because Kelly was having financial difficulties at the time.  Rauschenberg explained
that the “hot-shotting” business involved hauling trailers and vehicles on a
gooseneck trailer to locations throughout the continental United States.

 





[3]
          Rauschenberg also made the
insurance payments for the truck, but there is no indication in the record that
Kelly gave him any money for this expense.

 





[4]
          It is unclear whether this is a
reference to the Rauschenberg’s complaint at trial that the pickup “wouldn’t
pull” or a reference to poor fuel economy (i.e., mpg).





[5]
          Bossier Country is located in Fairfield.

 





[6]
          See Act of May 25, 1991,
72d Leg., R.S., ch. 501, § 23, 1991 Tex. Gen. Laws 1749, 1761-62 (former Tex. Rev. Civ. Stat. art. 4413(36), § 6.07(c))
(repealed 2001) (current version at Tex.
Occ. Code Ann. § 2301.604 (Vernon 2004)).

 





[7]
          See Act of May 25, 1991,
72d Leg., R.S., ch. 501, § 23, 1991 Tex. Gen. Laws 1749, 1763 (former Tex. Rev. Civ. Stat. art. 4413(36), § 6.07(h))
(repealed 2001) (current version at Tex.
Occ. Code Ann. § 2301.606(d)(2) (Vernon 2004)).





[8]
          Although Rauschenberg alleged breach
of contract in his petition, he did not request the submission of a jury
question on this theory of recovery.  Thus, he effectively non-suited his
breach of contract claim.  Cf. Alvarez v. Thomas, 172 S.W.3d 298, 300-01
(Tex. App.—Texarkana 2005, no pet.) (omission of defendant from amended
petition effectively non-suits claims against omitted defendant).





[9]
          The Supreme Court has granted
review on issues relating to the plaintiffs’ standing as putative class
representatives.  See DaimlerChrysler Corp. v. Inman, No. 03-1189, 48 Tex. Sup. Ct. J. 154, 154-55 (Tex. Dec. 3, 2004) (order granting review).





[10]
         It appears that the use of a
verified denial in the context of capacity to sue is most appropriate when the
plaintiff has alleged the existence of a corporation or partnership or that the
plaintiff is doing business under an assumed name or trade name and the
defendant disputes this allegation.  See Tex. R. Civ. P. 93(5), (6), (14); 2 Roy W. McDonald & Elaine A. Grafton Carlson, Texas Civil
Practice §§ 9.36, 9.39, 9.41 (2d ed. 2002).





[11]
         Bossier Country suggested in its
motion for new trial that it did object to this question, stating, “The Court
erred in submitting Question No. 1 to the jury, over Bossier’s objection . . .
.”  However, the reporter’s record does not bear out this assertion.





[12]
         Rauschenberg’s petition also
alleges breach of the implied warranty of fitness for a particular purpose. 
However, he did not request the submission of a jury question on this theory of
recovery.  Thus, he effectively non-suited this implied warranty claim.  Cf.
Alvarez, 172 S.W.3d at 300-01.

 





[13]
         Rauschenberg’s petition alleges
breach of “the express warranty issued on said vehicle, under which repairs
were to be made.”

 





[14]
         In Centex Homes, the Court
distinguished between the implied warranty of good and workmanlike performance
in the repair or modification of tangible goods or property (which cannot be
waived or disclaimed) and the implied warranty of good and workmanlike
construction in the construction of a new home (which “may be disclaimed by the
parties when their agreement provides for the manner, performance or quality of
the desired construction.”).  See Centex Homes v. Buecher, 95 S.W.3d 266,
270-75 (Tex. 2002).  At least one commentator has suggested that the disclaimer
rule announced in Centex Homes will eventually become the rule for
disclaimer of the implied warranty recognized in Melody Homes.  John
Krahmer, Commercial Transactions, 56 SMU
L. Rev. 1255, 1265 n. 92 (2003).  Regardless, even assuming that the disclaimer
rule of Centex Homes applies here, Rauschenberg’s “agreements” with Bossier
Country for repair services, though they each contain standard disclaimer
language, do not “provide[ ] for the manner, performance or quality of the
desired [repairs].”  See Centex Homes, 95 S.W.3d at 274-75.  Thus, even
under Centex Homes, Rauschenberg did not disclaim the implied warranty
of good and workmanlike performance.





[15]
         The term “section,” as used
hereinafter, refers to a section of the Business and Commerce Code unless
otherwise indicated.





[16]
         Black’s Law Dictionary defines an
“extended warranty” as:

 

                        An
additional warranty often sold with the purchase of consumer goods (such as
appliances and motor vehicles) to cover repair costs not otherwise covered by a
manufacturer’s standard warranty, by extending either the standard-warranty
coverage period or the range of defects covered.

 

Black’s
Law Dictionary 1619 (8th ed. 2004).





[17]
         A brief analysis of the invoices
for out-of state deliveries reveals that Jerry’s Auto charged $1.40 per mile
for deliveries in addition to the fuel surcharge.

 





[18]
         8 months x $1,666=$13,328.





[19]
         Bossier Country reaches this per
diem rate by dividing the monthly payment of $698.65 by 30 days.





[20]
         Bossier Country characterizes Rauschenberg’s
testimony as establishing only 3 trips to Bossier Country.  However, we read
his testimony as establishing 4 trips: (1) 1 trip on a Saturday, (2) 2 trips in
efforts to meet with Bossier Country management and a DaimlerChrysler
representative, and (3) 1 trip on a Friday (“One Friday, I came over, and I
don’t know which Friday it was.”).





[21]
         208 miles x 5 trips x 30 cents
per mile = $312.





[22]
         The 8 factors listed in Arthur
Andersen are:

 

            (1) the time and labor
required, the novelty and difficulty of the questions involved, and the skill
required to perform the legal service properly;

 

            (2) the likelihood . . .
that the acceptance of the particular employment will preclude other employment
by the lawyer;

 

            (3) the fee customarily
charged in the locality for similar legal services;

 

            (4) the amount involved
and the results obtained;

 

            (5) the time
limitations imposed by the client or by the circumstances;

 

            (6) the nature and
length of the professional relationship with the client;

 

            (7) the experience,
reputation, and ability of the lawyer or lawyers performing the services; and

 

            (8) whether the fee is
fixed or contingent on results obtained or uncertainty of collection before the
legal services have been rendered.

 

Arthur Andersen & Co. v. Perry Equip. Corp., 945 S.W.2d 812, 818 (Tex. 1997) (citing Tex. Disciplinary R. Prof’l Conduct
1.04(b), reprinted in Tex. Gov’t
Code Ann., tit. 2, subtit. G app. A (Vernon 2005) (Tex. State Bar R. art. X, § 9)).

 





[23]
         Remittitur is inappropriate on a
no-evidence finding.  Cf. Torrington Co. v. Stutzman, 46 S.W.3d 829, 851
(Tex. 2000) (“an appellate court may not order a remittitur unless the evidence
supporting damages is factually insufficient”).