**CHEMICAL EXPRESS CARRIERS, INC., and French & Bowen, Inc., d/b/a Young's Flying Service, Appellants,**

v.

**Wayne FRENCH, Hydrocarbon Trading & Transport, Inc., and Joe M. Pearson, Appellees.**

No. 13–87–090–CV.

Court of Appeals of Texas, Corpus Christi.

May 26, 1988.

Rehearings Denied June 30, 1988.

**684**

Royal H. Brin, Jr., P. Michael Jung, Strasburger & Price, Dallas, Charles W. Hury, Atlas & Hall, McAllen, for appellants.

M. Lloyd Seljos, Judin, Barron & Seljos, McAllen, Curtis Bonner, Bonner & Bonner, Harlingen, William H. Quirk, III, Robert M. Smith, Solomon H. Smith, Beckmann & Quirk, San Antonio, Michael T. Powell, Elkins, Powell and Young, Houston, for appellees.

Before KENNEDY, UTTER and SEERDEN, JJ.

## OPINION

KENNEDY, Justice.

This is an appeal from a judgment following a bench trial in three consolidated suits arising out of an airport fuel contamination incident. The parties are H. Wayne French and French & Bowen, Inc., d/b/a Young's Flying Service (collectively Young's), the operator of the facility where the contamination occurred; Joel Pearson (Pearson), the owner of an aircraft which was flown with contaminated fuel; Hydrocarbon Trading & Transport, Inc. (Hydrocarbon), the fuel supplier; and Chemical Express Carriers, Inc. (Chemical Express), the common carrier which delivered the fuel. The district court entered a complex judgment, from which Chemical Express has appealed.[1] The appellant brings five

---

1. Although French & Bowen filed an appeal bond, they did not file a brief and therefore raise no points of error.

points of error challenging the legal and factual sufficiency of the evidence, and two points complaining of the court's method of crediting the award against Chemical Express for a settlement between Pearson and Young's. We affirm.

This case arises out of the contamination of aviation fuel stored at Young's. On November 9, 1981, Chemical Express made a delivery of jet fuel to Young's. Young's has three tanks next to each other where it stores fuel: two tanks contain grades of fuel suitable only for use in jets; one tank contains a grade suitable for use in propeller-driven aircraft.

One of Young's employees directed a Chemical Express fuel truck to one of the jet tanks for a routine delivery of fuel. After filling the tank there was still excess fuel in the truck. Normally, excess fuel is stored in two separate tanks on the opposite end of the airfield. However, on the morning in question the Chemical Express driver emptied the remainder of his jet fuel into the tank designated for non-jet fuel. On the following morning, a delivery of non-jet fuel was added to the same tank. Appellant does not dispute its negligence in this matter on appeal.

The various grades of aviation gas can be distinguished in two ways: first, by color—jet fuel is straw colored, while the non-jet fuel involved here is blue; second, by smell.

In the present case, after the non-jet tank was contaminated, Young's failed to detect the extra jet fuel in the tank until such fuel had been delivered to several of the aircraft it serviced. When one of the pilots finally noticed the contamination, the aircraft involved in this suit had already been flown for varying times on the contaminated gas.

Pearson is an insurance agent who used one of the planes flown on contaminated gas in his business. He depended on the plane to ferry his clients and their accountants and attorneys back and forth from their offices in diverse parts of the state to Pearson's Houston office, where paperwork connected with his business was processed. After learning of the contamination, Pearson took his plane to Gen–Aero, the San Antonio dealer from which it was purchased. The local aircraft mechanic, Mr. Kilmer, advised Pearson that any engine run on contaminated fuel should be replaced with a new engine. Pearson agreed with Kilmer's recommendation and had both engines on his plane sent back to the manufacturer, Teledyne Continental Motors, for replacement. During November, while his engines were being replaced, Pearson was unable to find a substitute aircraft suitable for conducting business in the normal manner. Pearson's aircraft had been specially suited to carry his clients in comfort, and his business suffered without the aircraft.

Young's inspected the aircraft engines it owned that were flown on the contaminated gas for signs of damage. Some engines were replaced and some were merely overhauled, depending on the degree of damage.

Pearson initially brought suit against Young's and Chemical Express for the damages to his aircraft and business as a result of the contamination. Young's then brought a cross-action against Chemical Express for the damage it sustained as a result of the contamination. During the course of litigation, Pearson settled with Young's for $40,000.00, plus 25% of Young's recovery from Chemical Express, up to an aggregate maximum of $62,000. The case was then tried to the court, who found Chemical Express to be 75% negligent and Young's to be 25% negligent. The court then awarded Pearson $75,375.00 against Chemical Express, or 75% of his total damages. The court also awarded Young's $83,437.50 against Chemical Express.

In its first through fourth, and seventh points of error, appellant complains of both the legal and factual sufficiency of the evidence to support the court's findings.

In deciding a legal insufficiency, or "no evidence" point, we consider only the evidence and inferences which support the findings and disregard all evidence and inferences to the contrary. The point must be sustained if there is a complete absence

of, or no more that a scintilla of evidence which supports the findings. *McKnight v. Hill & Hill Exterminators, Inc.*, 689 S.W. 2d 206, 207 (Tex.1985); *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex.1965).

In reviewing a factual insufficiency, or "against the great weight and preponderance of the evidence" point, we consider all the evidence. Unless a finding, considering all the evidence, is so contrary to the weight and preponderance of the evidence as to be manifestly unjust, we must overrule the point. *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex.1986); *In Re King's Estate*, 150 Tex. 662, 244 S.W.2d 660 (1951).

■ In its first point of error, appellant complains that there was insufficient evidence for the trial court to find Chemical Express' negligence was the proximate cause of appellee's damages, because the negligent failure of the pilots and ground crew to discover the contamination before it caused harm was a new and independent cause which broke the causal chain to Chemical Express.

New and independent cause is not a separate issue, but is an element to be considered by the factfinder in determining the existence of proximate cause. *Dallas Railway & Terminal Co. v. Bailey*, 151 Tex. 359, 250 S.W.2d 379, 383–84 (1952); *McAllen Kentucky Fried Chicken No. 1 v. Leal*, 627 S.W.2d 480, 483 (Tex.App.—Corpus Christi 1981, writ ref'd n.r.e.). In *Humble Oil & Refining Co. v. Whitten*, 427 S.W.2d 313 (Tex.1968), the Court adopted the criteria in Restatement (Second) of Torts § 442 (1965) for deciding whether a new and independent cause has been shown:

The following considerations are of importance in determining whether an intervening force is a superseding cause of harm to another:

(a) the fact that its intervention brings about harm different in kind from that which would otherwise have resulted from the actor's negligence;

(b) the fact that its operation or the consequences thereof appear after the event to be extraordinary rather than normal in view of the circumstances existing at the time of its operation;

(c) the fact that the intervening force is operating independently of any situation created by the actor's negligence, or, on the other hand, is or is not a normal result of such a situation;

(d) the fact that the operation of the intervening force is due to a third person's act or to his failure to act;

(e) the fact that the intervening force is due to an act of a third person which is wrongful toward the other and as such subjects the third person to liability to him;

(f) the degree of culpability of a wrongful act of a third person which sets the intervening force in motion.

*Whitten*, 427 S.W.2d at 315; *see also Leal*, 627 S.W.2d at 483.

Chemical Express claims that the pilots and ground crew at Young's were unforeseeably negligent in not detecting the contamination before it caused harm, because they had adequate opportunity to discover the contamination in the following ways: Young's employees should have checked the amount of fuel in the tank and discovered the excess amount before placing non-jet fuel in the tank or transferring the contaminated fuel to Young's gas trucks; in fueling the planes the Young's employees should have noticed the difference in color and smell of the contaminated gas; the pilots should likewise have noticed the difference in color and smell of the gas during their pre-flight checks of the planes.

All of these may be unexpected acts of carelessness. However, such acts are clearly not new and independent causes under the above criteria: the harm to aircraft engines which occurred is not different in kind from that normally expected from contaminating gas; damage to aircraft engines is a normal, rather than extraordinary, consequence of contaminating the supply of gas; and the carelessness of pilots and crew was, if not expected, at least a normal result of the situation created by Chemical Express' negligence.

The intervening negligence of a third party will not excuse the first wrongdoer if such act should have been foreseen. *Clark v. Waggoner*, 452 S.W.2d 437, 440 (Tex. 1970); *Northwest Mall, Inc. v. Lubri–Lon International, Inc.*, 681 S.W.2d 797, 803 (Tex.App.—Houston [14th Dist.] 1984, writ ref'd n.r.e.); *see also McClure v. Allied Stores of Texas, Inc.*, 608 S.W.2d 901, 903 (Tex.1980); *Leal*, 627 S.W.2d at 483; *Bell Helicopter Co. v. Bradshaw*, 594 S.W.2d 519, 533 (Tex.Civ.App.—Corpus Christi 1979, writ ref'd n.r.e.). In *Bell Helicopter*, we rejected a similar claim that pilot error in failing regularly to check and maintain a defective tail rotor blade was a new and independent cause of a crash resulting from the blade's breaking. We overrule appellant's first point of error.

■ In its second point of error, appellant complains that the evidence was insufficient to support the trial court's award of $40,500.00 to Pearson for losses other than engine replacement costs. The award in question compensated Pearson for business losses which he incurred as a result of his loss of use of his airplane for the six week period.

Pearson testified that he used his aircraft to facilitate his business deals with clients residing more than 300 miles from Harlingen, comprising 85% of his total clientele. He needed the airplane on constant standby, so that it would be available whenever a client was ready. Pearson would then fly to the client's city and ferry the client, his accountants and his attorneys to Pearson's Houston office and back, to discuss the deal with Pearson's attorneys and sign the necessary documents.

Because of the age and wealth of his clientele, Pearson needed a pressurized cabin class aircraft, with a stair door and comfortable seating. Pearson testified that he was not able to find an adequate substitute aircraft for rent during the six week period. He further stated that, even if one had been available, a rented aircraft would have "ruined the finesse and casualness we needed to get the wealthy client involved."

As a result of being deprived of the use of his aircraft, Pearson claims to have lost all of his out-of-town business for that period. Pearson calculated his damages to be $52,000. This figure was based on his average yearly income for the three years prior to the accident and represents 85% of his income for a six week period. The trial court reduced this figure to $40,500.00. Nevertheless, appellant claims that the award is inflated and too remote and unforeseeable to be legally recoverable.

Long ago our Supreme Court adopted the rule of Restatement of Torts § 928 (1939), that " '[w]here a person is entitled to a judgment for harm to chattels not amounting to a total destruction in value, the damages include compensation for ... loss of use.' " *Pasadena State Bank v. Isaac*, 149 Tex. 47, 228 S.W.2d 127, 129 (1950); *see also Unitrust, Inc. v. Jet Fleet Corp.*, 673 S.W.2d 619, 621 (Tex.App.—Dallas 1984, no writ) (loss of use of an airplane). Generally, the correct measure for loss of use damages is the reasonable rental value of the property or a substitute. *Luna v. North Star Dodge Sales, Inc.*, 667 S.W.2d 115, 119 (Tex.1984); *Texas Tool Traders, Inc. v. Mosley Machinery Co.*, 422 S.W.2d 229, 231–32 (Tex.Civ.App.—Waco 1967, no writ). However, it is not a prerequisite to recovery of damages that the plaintiff actually rent a substitute during the period of the loss of use. *Luna*, 667 S.W.2d at 118. The primary purpose for allowing loss of use damages is not simply to compensate the plaintiff for the expenses of a substitute, but to award the owner actual pecuniary compensation for his loss. Latitude is allowed in determining damages where there is no precise measurement. *Mosley*, 422 S.W.2d at 231; *International Great Northern R. Co. v. Casey*, 46 S.W.2d 669, 670 (Tex.Comm'n.App. 1932, holding approved).

In the present case, Pearson's testimony is probative evidence that he had a thriving insurance business and a ready market, and that no adequate replacement aircraft could be rented that would not alienate his clientele. Where plaintiff loses an opportunity to accrue earnings from the use of an asset in a ready market, he is entitled to

recover his lost profits as loss of use damages. *Berry Contracting, Inc. v. Coastal States Petrochemical Co.*, 635 S.W.2d 759, 762 (Tex.App.—Corpus Christi 1982, writ ref'd n.r.e.) (shutdown of refinery); *see also McCullough—Baroid Petroleum Service v. Sexton*, 618 S.W.2d 119, 121 (Tex. Civ.App.—Corpus Christi 1981, writ ref'd n.r.e.) (damages to combine during harvest season); *Riddell v. Mays*, 533 S.W.2d 910, 911 (Tex.Civ.App.—Waco 1976, no writ) (damage to wrecker vehicle); *Southern Air Transport v. Gulf Airways, Inc.*, 215 La. 366, 40 So.2d 787, 791 (1949) (loss of use of airplane).

▮ Appellant claims, however, that the extent of Pearson's business losses as a result of a six week loss of use of his airplane was unforeseeable and should not be allowed in damages. We believe that appellant is confusing the foreseeability of the injury with the foreseeability of the extent of the injury. The foreseeability element of proximate cause requires only that the injury be of such general character as might reasonably have been anticipated. *Leal*, 627 S.W.2d at 482. It was clearly foreseeable that negligently contaminating aviation fuel might cause damage to, and loss of use of, commercial aircraft, and thus loss of profits to businessmen who regularly depend on their aircraft. Simply because Pearson was a highly successful businessman whose business was susceptible to unusually high losses even for short term loss of use of his airplane is no reason to deny or limit his recovery. The familiar rule generally applied to personal injury cases equally applies here, that the tortfeasor takes his victim as he finds him. *Padget v. Gray*, 727 S.W.2d 706, 711 (Tex. App.—Amarillo 1987, no writ); *Thompson v. Quarles*, 297 S.W.2d 321, 329 (Tex.Civ. App.—Galveston 1956, writ ref'd n.r.e.). In *Strachan Shipping Co. v. Petty Geophysical Engineering Co.*, 369 S.W.2d 526, 528 (Tex.Civ.App.—Waco 1963, writ ref'd n.r. e.), for instance, the Court allowed loss of use damages for damage to a seismographic drill truck being loaded on a vessel for overseas transportation, even though defendants had no knowledge of the special circumstances rendering special damages a probable consequence of the occurrence. Appellant's second point of error is overruled.

In its third point of error, appellant complains that the trial court erred in allowing appellees to recover the full value for engine repair and replacement, and disregarding the depreciated condition of the replaced engines and the overall betterment of the aircraft after replacement. The lifespan of an aircraft engine between overhauls is measured in flight hours commonly called "TBOs" (time before overhaul). It is uncontradicted that the aircraft engines involved in the present case had TBOs less than the TBOs of the replacement engines, which are equal to the original TBOs. Appellant claims that the damage award should have been proportionately reduced, based on the ratio of the TBOs before and after replacement.

Appellees contend that appellant cannot claim credit for a betterment, because they did not plead betterment. Appellees rely on the requirements for bringing up betterment announced in *Pasadena* that:

When the plaintiff introduced evidence to show the reasonable and necessary cost of restoring the accounting machine, including labor and transportation, to the identical condition it was in immediately prior to the damage thereto, a prima facie case was made out by the plaintiff. Presumably, if the expenses incurred restored the machine to the same condition it was in prior to the accident, there was no enhancement in its value. Under such a fact showing, if the defendant desired to *allege and prove* by competent evidence that the value of the machine had been enhanced by the repairs made on it, then it was incumbent upon him to *show defensively* that there had been an enhancement. While the burden of the whole case was upon the plaintiff, still when the prima facie showing was made, as in this instance, the *burden of proceeding* shifted to the defendant to *show* that the repairs, as made, resulted in added value to the article in question.

*Pasadena*, 228 S.W.2d at 129 (emphasis added):

■ Appellees submit that *Pasadena* requires a defendant to allege by way of his pleadings his intent to rely on the betterment to reduce the amount of damages. *See Merrill v. Tropoli*, 414 S.W.2d 474, 476 (Tex.Civ.App.—Waco 1967, no writ). However, we believe that *Pasadena* does not require a defendant specifically to plead betterment, but does place upon defendant the "burden of proceeding" with evidence to "show defensively" that a betterment has occurred, *see Hollingsworth Roofing Co. v. Morrison*, 668 S.W.2d 872, 876 (Tex. App.—Fort Worth 1984, no writ); *Nielson v. Okies*, 503 S.W.2d 614, 616 (Tex.Civ.App. —El Paso 1973, no writ), and the burden of proof that there has been an enhancement. *Sexton*, 618 S.W.2d at 120.

■ The evidence which appellant claims conclusively shows an enhancement of value are the increase in replacement engine TBO's and the testimony of appellee's expert witness, Mr. Kilmer.

We cannot simply infer that, when damaged parts are replaced with new parts after an accident, the value of the whole machine is increased. *See Mutual Fire & Auto Ins. Co. v. Green*, 235 S.W.2d 739, 743 (Tex.Civ.App.—Fort Worth 1950, no writ). Simply because an aircraft can be restored to its pre-accident condition or better in one respect (e.g., new engines) does not necessarily mean that the value of the whole aircraft is equal to, or greater than, before the accident. *See Unitrust*, 673 S.W.2d at 621. Many factors affect the value of a complex piece of property like an aircraft. We cannot assume that after a major accident any one factor will be conclusive of the aircraft's increase or diminution in value.

Appellant further relies on the testimony of Kilmer in response to the trial court's questions as follows:

THE COURT: So isn't my [the] aircraft more valuable with the new exchanged overhaul in it than it was the day before I used the fuel that was contaminated?

THE WITNESS: *I would suggest that the resale value, in other words, to some extent it is based on the engine time, that is the TBO, and it would have an additional value.*

THE COURT: Well, in other fields of law, we call that a betterment. In other words, I bettered myself by another 500 hours in replacing it. Would you say that it's pretty much related mathematically? In other words, if I put a new engine in it after I had used a third of the hours on the old engine, have I bettered it about a third of the cost of the new engine?

THE WITNESS: I doubt if it would be that much. But you would have bettered it to some degree. I don't think you could determine it on the exact number of hours. *There are other factors that would enter into it.*

THE COURT: Well, let's talk specific here for a moment. This first one here, the PA31–350, it got new engines. There is testimony that the old engines had 800 on them. Is there any way you can say with a reasonable probability how much bettered that airplane was with the two new exchanged overhauled engines in it than when it had the 800 hours on it?

\* \* \* \* \* \*

THE WITNESS: The airplane would then, in my opinion, would have in your words betterment. If the engines were not overhauled and they are just inspected, they would have a lesser value.

A consistent interpretation of Kilmer's first response would be that, to the extent the resale value is based on the TBO, the aircraft would have an additional value after an exchange overhaul. This does not mean that "other factors" would not still decrease the value of the aircraft as a whole after the accident below its pre-accident value. Kilmer's testimony is far from proving either as a matter of law or by the great weight and preponderance of the evidence that the aircraft has been bettered. Appellant's third point of error is overruled.

■ In its fourth point of error, appellant complains that the trial court erred by failing to take into account Pearson's entitlement to a $9,600.00 core deposit refund

in awarding engine replacement damages to him.

Appellant introduced into evidence the invoice Pearson received when he turned his aircraft over to Gen–Aero for shipment to the manufacturer and replacement of the engines. Gen–Aero noted at the bottom of the invoice: "Core deposit—½ of $9,600.00 = $4,800.00 per engine. Old engines will be returned for core credit. Any or all of core deposit will be refunded when credit received."

However, Kilmer testified on cross-examination as follows:

Q. What conditions do engines have to be in to get the core deposit?

A. The normal condition is that it doesn't have a busted or cracked case or a cylinder. In other words, if it is a basket case, then the manufacturer, the overhaul facility would not normally give you a full core deposit on the engine.

Pearson testified that the manufacturer had destroyed the engines and did not give him a core deposit, even after repeated requests to the manufacturer and Kilmer. The evidence, taken in the light most favorable to appellee, suggests that his engines were totally unusable, and thus the type of "basket cases" for which a core deposit would be denied. Appellant's fourth point of error is overruled.

■ In its seventh point of error, appellant complains that there was insufficient evidence to establish the necessity of any replacement of aircraft engines. Appellant points to the testimony of its expert, Kirkwood, that the engines should have been visually inspected and the compression checked before determining that the contaminated fuel had damaged them beyond repair. It also points to a letter by the manufacturer, Teledyne, sent to Young's and Pearson which suggested that the engines first be inspected, and then, if damage is found, replaced with factory rebuilt engines.

However, Kilmer testified that any engine which has been run on contaminated fuel is subject to excessive metal stress which cannot be detected until the individual parts begin to crack and fail, and that any aircraft flown on contaminated fuel should be sent back to the manufacturer for a factory rebuilt engine. Although Kilmer had not personally worked on contaminated engines before, he demonstrated an expert's knowledge of the mechanical forces involved and the consequences of running an engine on contaminated fuel. The trial court acted within its discretion as factfinder in accepting Kilmer's testimony and discrediting contrary indications in Kirkwood's testimony and the manufacturer's letter. Appellant's seventh point of error is overruled.

■ In its fifth and sixth points of error, appellant complains that the trial court erred in awarding Pearson damages against them based on their percentage of negligence, rather than giving appellant credit against Pearson's total damages in the amount of the settlement Pearson had already made with Young's, or, in the alternative, in the amount of 50% of Pearson's total damages.

The trial court credited appellant with the percentage of Pearson's damages attributable to Young's negligence, in accordance with Tex.Civ.Prac. & Rem.Code Ann. § 33.015 (Vernon 1986) [2]:

> Settlement: Tort–Feasor Party Defendant
>
> If an alleged joint tort-feasor settles with a claimant but is joined as a party defendant when the case is *submitted to the jury* so that the existence and amount of his negligence are *submitted to the jury* and his percentage of negligence is *found by the jury,* the settlement is a complete release of the portion of the judgment attributable to him. [emphasis added]

Appellant argues that § 33.015 does not apply to cases which are submitted to the trial court rather than a jury. Appellant

---

**2.** The predecessor to § 33.015 was Tex.Rev.Civ. Stat.Ann. art. 2212a, § 2(e) (repealed). During the pendency of this appeal, moreover, § 33.015 has also been significantly amended, taking effect September 2, 1987. This opinion has little application to the amended version of § 33.015.

contends that we must disregard Chapter 33 of the Civil Practice & Remedies Code altogether, as inapplicable to such cases, and look to the prior common law methods of accounting for settlements in *Bradshaw v. Baylor University*, 126 Tex. 99, 84 S.W.2d 703 (1935), and *Palestine Contractors v. Perkins*, 386 S.W.2d 764 (Tex.1964). In *Bradshaw*, the Court allowed a non-settling tortfeasor a dollar-for-dollar credit for the amount of the settlement paid by another tortfeasor, on the theory that the plaintiff was entitled to only "one satisfaction" of the damages found by the jury. In *Palestine*, the Court allowed the non-settling tortfeasor to take a proportionate reduction, based on the number of settling tortfeasors divided by the total number of tortfeasors, where the settlement amounted to less than the settling tortfeasors' proportionate share of damages found at trial. These two methods existed side by side and the non-settling tortfeasor was allowed to elect the more advantageous of the two after damages were found at trial. *See Deal v. Madison*, 576 S.W.2d 409, 416 (Tex.Civ.App.—Dallas 1978, writ ref'd n.r.e.).

With the advent of comparative fault, however, the *Bradshaw* and *Palestine* methods became obsolete and are disfavored by the courts. In *Duncan v. Cessna Aircraft Co.*, 665 S.W.2d 414, 431 (Tex.1984), which introduced comparative fault into products liability cases, the court specifically disapproved the old methods:

> The reasoning behind the one recovery rule no longer applies. The system of comparative causation we adopt allows allocation of liability between the parties, even when the injury itself is indivisible. *Cf.* Art. 2212a (apportioning liability in negligence cases). Because each defendant's share can now be determined, it logically follows that each may settle just that portion of the plaintiff's suit. The settlement does not affect the amount of harm caused by the remaining defendants and likewise should not affect their liability.

*See also Cypress Creek Utility Service Co. v. Muller*, 640 S.W.2d 860, 867 (Tex.1982).

Both *Duncan* and *Cypress* seem to tacitly assume that article 2212a replaced the old methods, so these cases do not specifically overrule *Bradshaw* or *Palestine* in the negligence context. Nevertheless, even assuming that negligence cases tried to the court are not covered by § 33.015, we will follow our holding in *Merit Drilling Co. v. Honish*, 715 S.W.2d 87, 89 (Tex.App.—Corpus Christi 1986, writ ref'd n.r.e.), that "one need not look any further than *Duncan v. Cessna Aircraft Co.*, 665 S.W.2d 414 (Tex.1984), to determine that what little efficacy was left to the *[Bradshaw]* doctrine is to be found *only* in its statutory embodiment in Article 2212a. [emphasis added]"

We hold that, either on the basis of § 33.015 or under the new common law approach of *Duncan*, the trial court's determination of comparative negligence among settling and non-settling tortfeasors has the effect of releasing the non-settling tortfeasors from liability for the percentage of damages attributed to the settling tortfeasors. Appellant's sixth point of error is overruled.

The judgment of the trial court is AFFIRMED.