

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-12-00096-CV

_____

CORRINE AUGUSTINE HILL SHEARER AND SAM HILL, Appellants

V.

DAVID SHEARER, INDEPENDENT ADMINISTRATOR OF THE ESTATE OF
JOHN WILLIAM SHEARER III, DECEASED, Appellee

On Appeal from the County Court at Law No. 2
Gregg County, Texas
Trial Court No. 2010-0265-P-1

Before Morriss, C.J., Carter and Moseley, JJ.
Memorandum Opinion by Chief Justice Morriss

## MEMORANDUM OPINION

Before the onset of the illness that ultimately took the life of John William Shearer, III, John owned and operated a business known as Shearer's Autoplex, which largely provided towing services under the name "271 Wrecker" and also sold used cars. The business' landlord was a company owned by John's ex-wife, Corrine Augustine Hill Shearer.[1] John's sickness in November 2009 prompted his hospitalization and resulted in Corrine directing her son, Sam, to take possession of, and to run, the business during John's illness and for a period of time after his December 9, 2009, death.[2] The ensuing dispute between John's Estate on one side and Corrine and Sam on the other ultimately resulted in a judgment for John's Estate that contained the following elements:

1.  Judgment against Corrine:
    a.  Actual damages for conversion, $140,000.00,
    b.  Pre-judgment interest on actual conversion damages, $7,583.33, and
    c.  Exemplary damages for "willful" conversion, $120,909.00,
    d.  Offset by $4,500.00 for rents due on the premises.

---

[1]John was survived by three children: David and Wendy from his first marriage and a daughter, Shelly, adopted during his second marriage. He had no children with Corrine, his third wife. John had married Corrine in 1990. From a prior marriage, Corrine had a child, Sam Hill. John and Corrine divorced in 2008. Despite the divorce, they continued living together as they did before the divorce. Corrine described them as life partners and as still being married in her heart. The divorce was described as having been an "estate planning maneuver" to shelter their assets from potential loss from a bad loan. The Autoplex was not mentioned in the divorce, though Corrine's testimony established that its assets were solely John's property.

[2]In early November 2009, John was hospitalized with a perforated bowel. After Corrine directed Sam to look after the business, Sam effectively took over management. It is a contested point of fact whether John directed Corrine to send Sam to look after the business.

John's condition worsened, and he died. The day before John's death, Corrine signed a do not resuscitate (DNR) order. She is listed in the hospital documentation, including the DNR and death certificate, as John's wife. Corrine also had John's remains cremated. She did not inform David or Wendy of either the DNR or the cremation. The latest will executed by John left everything to Corrine. The complication was, however, that its execution preceded the divorce, resulting in John being intestate at the time of his death.

2. Judgment against Sam:
   a. Actual damages for conversion, $10,000.00,
   b. Pre-judgment interest on actual conversion damages, $541.66,
   c. Exemplary damages for "willful" conversion, $120,909.00,
   d. Actual damages for breach of fiduciary duty, $1,595.00,
   e. Pre-judgment interest on actual fiduciary damages, $86.39, and
   f. Exemplary damages for malicious breach of fiduciary duty, $120,909.00.

Faced with Corrine's and Sam's appeals and the Estate's cross-appeal, we affirm most elements of the judgment—specifically the elements designated 1a, 1b, 1d, 2a, 2b, 2d, and 2e above—we reverse and render a take-nothing judgment on the elements 1c and 2c above; and we reverse and remand the element 2f above to the trial court for further proceedings consistent with this opinion.

After setting out the salient facts, we discuss our reasons for our dispositions in this order:

A.   Conversion damages were properly awarded, since
     (i.)   Corrine and Sam's use of the property exceeded any superior right of possession, and
     (ii.)   the evidence does not establish effective consent to Corrine and Sam's use of the property.
B.   The evidence was insufficient to support recovery of lost profits.
C.   The evidence was insufficient to show conversion of money.
D.   The fiduciary relationship ended at John's death.
E.   Corrine did demonstrate a right to an offset for rent due.
F.   The jury finding of "willful" conversion fails to support exemplary damages.
G.   After the reduction of actual damages for breach of fiduciary duty, exemplary damages based on those actual damages should have been reviewed for proportionality.

3

After the dispute arose,[3] John's son, David Shearer, as Independent Administrator of John's Estate, filed suit against Corrine and Sam in March 2011. After a jury trial, the trial court disallowed all damages for breach of fiduciary duty that accrued after John's death (all but $1,595.00) because it held, as a matter of law, that the fiduciary duty to John ended when he died. The trial court also disallowed conversion damages for lost profits and conversion of money because it deemed the evidence supporting those causes of action to be legally insufficient.[4]

---

[3]Sam operated the Autoplex for at least several months. During that time, the Autoplex defaulted on its lease with American Real Estate Services, an assumed name of Corrine's Real Estate Services, LLC. American Real Estate claimed a landlord's lien against all tow trucks, tools, and equipment. The Autoplex continued to operate even after the lien was filed.

Corrine and Sam claimed that when John died, Shearer's Autoplex ceased to exist, though the business was still operating. During the two months following John's death, Corrine had $9,800.00 in checks written to her from the Autoplex's account, online transfers totaling $9,275.00 were made from the Autoplex to new business accounts opened by Corrine, and Sam removed $6,090.00 in cash from the Autoplex.

Sam and Corrine claim that the funds paid them were reimbursement for funds Corrine and her businesses advanced to the Autoplex for the payment of operating expenses, bills, taxes, and rent. The Estate disputes their claim.

In January 2010, Corrine filed an assumed name certificate for Gladewater Auto & Wrecker Service, listing its location at the Autoplex's address of 1825 East Broadway. In late January and early February, she and Sam formed 271 Ventures, LLC, and filed an assumed name certificate for 271 Wreckers, with an address of 1825 East Broadway.

The Autoplex, however, was still doing business in its own name. Its tow trucks were being used, as well as its licenses, permits, tools, and equipment. These are the items that the Estate claims were converted (specifically the tools, trucks, and equipment).

In January 2010, David and Wendy, as heirs, made demand on Corrine and Sam for the return of the Autoplex's property, and subsequently filed suit for recovery of the property and the income of the business. The suit was dismissed for lack of standing because no administration had been opened and no administrator appointed. In November 2010, David was appointed administrator, and he again made demand for the return of what he claimed was property of the Estate. This action was filed March 16, 2011, seeking declaratory judgment, an accounting, recovery of Estate property, post-divorce division of property, as well as damages for breach of fiduciary duty and conversion. Corrine and Sam answered and asserted a counterclaim for declaratory judgment, foreclosure of a lien on the Estate's property, recovery of cremation expenses, payment of personal property taxes, unpaid rent, and repayment of loans and advances Corrine allegedly paid to John.

[4]The jury assessed a total of $487,300.00 in damages against Corrine for conversion and breach of fiduciary duty in addition to $120,909.00 in exemplary damages. The jury also assessed a total of $15,365.00 in damages against Sam for conversion and breach of fiduciary duty in addition to $120,909.00 for exemplary damages. Many of the

On appeal, Corrine and Sam contend that (1) the trial court erred in granting judgment for conversion because Corrine and Sam had a superior right of possession; (2) the trial court erred in granting judgment for conversion because John and/or David expressly or impliedly consented to the taking; (3) the judgment's award of exemplary damages for conversion was improper because the jury questions allowed exemplary damages for "willful" conduct; and (4) after the trial court reduced the damages against Sam for breach of fiduciary duty, the trial court failed to review the exemplary damage award against Sam in light of that reduction. The Estate's cross-appeal asserts that (1) the trial court erred in holding that the fiduciary duty Corrine and Sam owed to the decedent ended on the decedent's death, (2) the trial court erred in disallowing the damages for conversion of money because sufficient evidence supported the award, (3) the trial court erred in granting judgment to Corrine on her counterclaim for breach of lease, and (4) the trial court erred in disallowing the damages for lost profits.

## A. Conversion Damages Were Properly Awarded

### (i.) Corrine and Sam's Use of the Property Exceeded any Superior Right of Possession

The jury found that Corrine and Sam converted property belonging to the Estate. Corrine and Sam contend that they conclusively established a superior right of possession of the property under the 2007 Lease Agreement between the Autoplex and American Real Estate.

---

damages found by the jury are duplicate damages putting the Estate to an election. On Corrine's counterclaim, the jury found $4,500.00 against the Estate for the Autoplex's breach of the lease.

After two hearings on post-trial motions, the trial court disallowed all breach-of-fiduciary-duty damages that accrued after John's death (all but $1,595.00), because it held, as a matter of law, that the fiduciary duty to John ended when he died. The trial court also disallowed conversion damages for lost profits and conversion of money because the evidence supporting those causes of action was legally insufficient. These legal rulings and factual findings left the final judgment in the form set out above.

The named parties to the lease are Shearer's Autoplex as "tenant" and "American Real Estate" as "landlord." According to Corrine's testimony, Corrine's Real Estate Services, LLC, is the owner of the property, and she is the owner of the company. American Real Estate Services is an assumed name of the company. Though the initials at the bottom of each page of the lease appear to be "CS," Corrine is not the signing agent on the lease, as the landlord's signature is by "S.Newman."

At trial, Corrine argued that the business was in default under the lease. The jury agreed and found default. However, the lease default notice, filed in December 2009, was made by American Real Estate Services and signed by Corrine as "owner/agent." The authenticated claims for property taxes and rentals due were filed in the name of American Real Estate, and both claims were signed by Corrine "as representative of AMERICAN REAL ESTATE."

Corrine cites multiple cases in support of her argument that she had the superior right of possession. In *Enduro Oil Co. v. Parish & Ellison*, a law firm that provided legal services to the operator of an oil well sued the operator's successor in interest and the oil purchaser alleging that it constituted conversion for the operator and purchaser to refuse to pay funds to the law firm from their suspense accounts pursuant to the firm's lien. *Enduro Oil Co. v. Parish & Ellison*, 834 S.W.2d 547, 549 (Tex. App.—Houston [1st Dist.] 1992, writ denied). The court of appeals held that the operator had a superior right to the funds pursuant to the operating agreement, so the firm could not recover for conversion.

Similarly, in *Pollard Friendly Ford Co. v. Johnson*, Johnson sued an automobile dealer and two of its salesmen for conversion of Johnson's car, which was purportedly traded in on the

6

purchase of another vehicle. *Pollard Friendly Ford Co. v. Johnson,* 487 S.W.2d 829 (Tex. Civ. App.—Amarillo 1972, no writ). The jury found that the dealer had converted Johnson's car. The court of appeals reversed the trial court's finding that the dealer converted Johnson's car and held that the jury's findings that Johnson signed the purchase contract, that the dealer paid the existing lien on Johnson's trade-in, and that Johnson took possession of the new car from the dealer's lot under circumstances justifying the dealer's belief that Johnson was purchasing the vehicle with his car being left in their possession as part of the purchase price were in irreconcilable conflict with the jury's findings of conversion. The court ordered a new trial. *Id.*

Here, neither *Enduro Oil* nor *Pollard Friendly Ford* are applicable because, even if the lease granted Corrine and Sam, in their individual capacities, a right to take possession of the property as landlord, Corrine and Sam's use of the property exceeded any right granted to them by the lease. Rather than acting as the holder of a landlord's lien by taking possession of the property and pursuing a sale of that property, they used the property to operate the business and its wrecker service. We overrule this point of error.

*(ii)     The Evidence Does Not Establish Effective Consent to the Use of the Property*

Corrine and Sam contend that judgment against them for conversion damages was improper because John and his Estate had expressly or impliedly given consent. There can be no conversion where the owner has expressly or impliedly assented to the taking or disposition. *Robinson v. Nat'l Autotech, Inc.*, 117 S.W.3d 37, 39–40 (Tex. App.—Dallas 2003, pet. denied).

Corrine argues that the property and business were rightfully in Corrine and Sam's possession because John had authorized it before his death and that David as the representative

7

of the Estate either expressly or impliedly consented to the possession during a meeting at the office of Corrine's counsel.

Sam testified that, on November 2, 2009, while John was hospitalized, Corrine asked Sam to go to the Autoplex and "keep an eye on things at the request of John Shearer." Sam understood that he was doing this on John's behalf. However, he did not speak with John that day or thereafter. As John's stepson, Sam was "helping take care of [John's] business," but he "didn't make a determination at that time in [his] own mind that [he] was anybody's agent nor" did Sam make such a determination at trial. About three months after John's death, Corrine's counsel at the time, Brad Echols, sent David's counsel a letter stating that John put Corrine in charge of the business.

In January 2010, about a month after John's death, a meeting was held at Echols' office. Corrine and Sam attended, as did David and his sister Wendy. According to Echols' March 2010 letter, David indicated at the meeting that he and his sister "did not intend to seek an administration of the Estate and did not plan to continue the business." Corrine contends that, at trial, David "never specifically denied the foregoing quotes attributed to him by Mr. Echols' letter" and that his testimony merely equivocated the point that "he expressly or impliedly consented to Corrine's and Sam's continuing their possession of John's property."

At trial, David testified about that meeting:

Well, there was some discussion about the business. Corrine and Sam were operating the business, there was discussion about the employees and, you know, keeping them employed, I knew several of them, I didn't want to shut the business down for their sake. They'd been good employees for my father. I really didn't know what to do about the business. I had asked if I could go up there. I was told I could not.

8

David did not recall saying he did not plan to seek administration of the Estate. From the information he was given at the meeting, his continuing the business "sounded pretty much impossible" because he would have to move the business due to the lease default, and it was already in dire financial condition according to the information he learned from Corrine and Sam at the meeting.

Because the jury found conversion—the unauthorized and wrongful exercise of dominion and control over another person's property—the jury rejected the argument that John and/or David consented to the taking. Even if David made the statement attributed to him in the letter, it cannot reasonably be interpreted to grant permission or otherwise authorize Corrine and Sam to take and use the property. Even if David's statement in the letter could be reasonably interpreted to authorize the taking, the statement is not binding on the Estate because David was just an heir at that time; the administration had not yet been established. *See In re Estate of Hutchins*, 391 S.W.3d 578, 588–89 (Tex. App.—Dallas 2012, no pet.) (family settlement agreement does not divest administrator of right to possess decedent's property). We overrule this point of error.

B.    *The Evidence Was Insufficient to Support Recovery of Lost Profits*

When it disallowed the lost profits awarded by the jury, the trial court independently found that "the evidence on the issue of lost profits was legally insufficient to establish lost profits with reasonable certainty." As part of its cross-appeal, the Estate contends that that evidence is sufficient.

9

The usual measure of damages for loss of use is the reasonable cost of renting replacement property. *Luna v. N. Star Dodge Sales, Inc.*, 667 S.W.2d 115, 119 (Tex. 1984), *overruled in part on other grounds by St. Elizabeth Hosp. v. Garrard*, 730 S.W.2d 648 (Tex. 1987); *Wells Fargo Bank Nw., N.A. v. RPK Capital XVI, L.L.C.*, 360 S.W.3d 691, 710 (Tex. App.—Dallas 2012, no pet.). A party that loses the opportunity to accrue earnings from the use of the party's equipment may also, however, be entitled to recover damages in the form of lost profits. *See Amelia's Auto., Inc. v. Rodriguez*, 921 S.W.2d 767, 771 (Tex. App.—San Antonio 1996, no writ) (considering lost profits as loss-of-use damages where plaintiff was deprived of use of tow truck); *Chem. Express Carriers, Inc. v. French*, 759 S.W.2d 683, 687–88 (Tex. App.—Corpus Christi 1988, writ denied) (discussing lost profits as loss-of-use damages where plaintiff lost use of airplane).

Lost profits are damages for the loss of net income to a business and, generally, reflect income from lost business activity, less expenses that would have been attributable to that activity. *Kellmann v. Workstation Integrations, Inc.*, 332 S.W.3d 679, 684 (Tex. App.—Houston [14th Dist.] 2010, no pet.). Recovery for lost profits does not require that the loss be susceptible to exact calculation, but the injured party must do more than show it suffered "some" lost profits. *Helena Chem. Co. v. Wilkins*, 47 S.W.3d 486, 504 (Tex. 2001) (citing *Tex. Instruments, Inc. v. Teletron Energy Mgmt., Inc.*, 877 S.W.2d 276, 279 (Tex. 1994)). In such a fact-intensive determination, testimonial opinions on lost-profit estimates must, at a minimum, be based on objective facts, figures, or data from which the lost profits may be ascertained. *Helena Chem. Co.*, 47 S.W.3d at 504 (citing *Szczepanik v. First S. Trust Co.*, 883 S.W.2d 648, 649 (Tex. 1994);

10

*Holt Atherton Indus., Inc. v. Heine*, 835 S.W.2d 80, 84 (Tex. 1992)). The injured party must prove the amount of the loss by competent evidence and with reasonable certainty. *Id.* (citing *Szczepanik*, 883 S.W.2d at 649; *Heine*, 835 S.W.2d at 84). "Reasonable certainty" is not shown when the profits claimed to be lost are largely speculative, as from an activity dependent on uncertain or changing market conditions, on risky business opportunities, or on promotion of untested products or entry into unknown markets or unproven enterprises. *Tex. Instruments, Inc.*, 877 S.W.2d at 279; *Atlas Copco Tools, Inc. v. Air Power Tool & Hoist, Inc.*, 131 S.W.3d 203, 206–07 (Tex. App.—Fort Worth 2004, pet. denied).

A party seeking lost profits must demonstrate the manner of calculating those lost profits. *Heine*, 835 S.W.2d at 84. That calculation must be based on net profits, not gross revenue or gross profits. *Kellmann*, 332 S.W.3d at 684.

In *Kellmann*, the court found the evidence legally insufficient to support an award of lost profits when it was based just on testimony regarding various invoices plaintiff issued to clients over a four-year period. *Id.* at 685. In the case of *Szczepanik*, First Southern Trust's secretary and treasurer testified that the company expected to make a profit beginning in 1991 between $250,000.00 and $500,000.00 per year, but the court found that evidence legally insufficient to support the award of lost profits: "There is nothing in the record to show how [plaintiff] determined the amount of lost profits." *Szczepanik*, 883 S.W.2d at 650. In *University General Hospital, LP v. Prexus Health Consultants, LLC*, the court found legally insufficient evidence when the plaintiff's top executive testified that its revenue would have been about $8 million and that it had lost about $2.4 million over three years as a result of the defendant's conduct, but

11

failed to provide facts, figures, or data explaining how he arrived at those numbers. *Univ. Gen. Hosp., LP v. Prexus Health Consultants, LLC*, No 14-11-00988-CV, 2013 WL 3312358, at \*\*4–5 (Tex. App.—Houston [14th Dist.] June 20, 2013, no pet. h.).

By contrast, in *White v. Southwestern Bell Telephone Company*, the plaintiff sought to recover lost profits resulting from Southwestern Bell's incorrect listing of his telephone number in the yellow pages in 1978. *White v. Sw. Bell Telephone Co.*, 651 S.W.2d 260, 261 (Tex. 1983). In finding sufficient evidence and reversing a directed verdict in favor of Southwestern Bell, the court noted that the evidence of lost profits included sales data from 1974 through 1980 and the testimony of a certified public accountant who used linear regression analysis to determine what the plaintiff's sales should have been in 1978. *Id*. at 262.

David gave extensive testimony regarding the value of the tools and equipment that were converted and was allowed to testify regarding the fair market value of the same. Regarding lost profits, David testified that, in a good month, the profits were $15,000.00, and in a bad month, $10,000.00, with an average of about $12,500.00.[5] On cross-examination, David admitted that he had no idea what the business' reported net income was for 2008, the year before John's death. David did not know what the wrecker service's expenses were in any year.

Even though David's testimony is based on his memory from 2005 and before, his years of experience at the car lot, and what his dad had told him, there are no objective facts, figures, data, or calculations to show how those amounts were determined. Therefore, we agree with the

---

[5]The jury's award of lost profits amounts to $12,500.00 per month for twenty-seven months, that is, the time from the month after John died through the month of trial.

trial court that the evidence supporting lost profits was legally insufficient. We overrule this point on cross-appeal.[6]

C.      *The Evidence Was Insufficient to Show Conversion of Money*

The jury assessed the sum of $9,800.00 against Corrine for conversion by issuance of checks and the sum of $9,275.00 against Sam for conversion by issuance of on-line transfers and $6,090.00 for conversion by use of cash receipts. The trial court ruled, however, that the evidence was legally insufficient to establish conversion of money. The Estate argues that the trial court erred in finding there was legally insufficient evidence to support the Estate's claim for conversion of money. We disagree.

---

[6]The jury awarded the Estate $140,000.00 for the fair market value of the converted property as well as $337,500.00 in lost profits. The jury made the same damage awards again pursuant to their finding that Corrine breached her fiduciary duty to John. The trial court refused entry of judgment for such damages, holding, "as a matter of law, . . . a Plaintiff cannot recover both the fair market value of assets converted as well as lost profits arising from the conversion of the same assets." As part of its cross-appeal, the Estate argues that the trial court's rulings on this issue were error because "equity required [the ability] to recover for loss of use of the converted property" as well as the market value of the converted property.

A plaintiff who establishes conversion is entitled to either (1) the return of the property and damages for loss of its use during the time of its detention, or (2) the value of the property. *See Wiese v. Pro Am Servs. Inc.*, 317 S.W.3d 857, 862 (Tex. App.—Houston [14th Dist.] 2010, no pet.); *Varel Mfg. Co. v. Acetylene Oxygen Co.*, 990 S.W.2d 486, 497 (Tex. App.—Corpus Christi 1999, no pet.). The plaintiff may not generally recover in conversion both for the market value of the property and for loss of use. *Varel Mfg.*, 990 S.W.2d at 497. However, "[i]n conversion cases, the trial court must be given the discretion required to fashion an equitable remedy." *Storms v. Reid*, 691 S.W.2d 73, 75 (Tex. App.—Dallas 1985, no writ) (court denied election of return of the property or fair market value because it would result in overcompensation).

The Estate argues that equity requires that, where a plaintiff loses the right to accrue earnings from the use of property, he or she is entitled to recover for such loss of use. *See Chemical Exp. Carriers, Inc. v. French*, 759 S.W.2d 683, 687–88 (Tex. App.—Corpus Christi 1988, writ denied). In *Chemical Express Carriers*, the plaintiff lost the use of his airplane for six weeks because contaminated fuel ruined the engines. *Id.* at 684–85. He was awarded loss of use damages as well as the cost of replacement engines. *Id.* at 685. The case is distinguishable because the owner of the plane did not receive loss-of-use damages in addition to the fair market value of the plane.

Generally, for conversion claims, a plaintiff may not recover both market value and loss of use. *Varel Mfg.*, 990 S.W.2d at 497. The Estate fails to cite special circumstances or any caselaw allowing an award of fair market value of converted property in addition to the lost profits arising from the loss of use due to the same conversion, and we are aware of none.

13

Conversion consists of the wrongful exercise of dominion or control over another's property in denial of, or inconsistent with, the other's rights. *Estate of Townes v. Townes*, 867 S.W.2d 414, 419 (Tex. App.—Houston [14th Dist.] 1993, writ denied). Money is subject to conversion only when it can be identified as a specific chattel and where there is an obligation to deliver the specific money in question or otherwise particularly treat the specific money. *Id.* There is no conversion where an indebtedness may be discharged generally by the payment of money. *Paschal v. Great W. Drilling, Ltd.*, 215 S.W.3d 437 (Tex. App.—Eastland 2006, pet. denied); *Newsome v. Charter Bank Colonial*, 940 S.W.2d 157, 161 (Tex. App.—Houston [14th Dist.] 1996, writ denied); *Townes*, 867 S.W.2d at 419. An action for conversion of money will lie where the specific money is (1) delivered for safe keeping, (2) intended to be kept segregated, (3) substantially in the form in which it is received or in an intact fund, and (4) not the subject of a title claim by its keeper. *Phippen v. Deere & Co.*, 965 S.W.2d 713, 724 (Tex. App.—Texarkana 1998, no pet.); *Townes*, 867 S.W.2d at 419–20.

A suit for conversion will not lie where a debtor-creditor relationship is created by deposit of a check to the depositor's account, because deposited money becomes the property of the bank. *See Mauriceville Nat'l Bank v. Zernial*, 892 S.W.2d 858, 860 (Tex. 1995). The making and acceptance of an ordinary deposit creates, as between the bank and the depositor, the relation of debtor and creditor, the title to the money passing to the bank. *Newsome*, 940 S.W.2d at 161.

In *Townes*, most of the pertinent facts were stipulated to. *Townes*, 867 S.W.2d at 420. Michael Townes managed the financial affairs and investment accounts of his mother, Aileen

Townes. *Id.* As his mother's agent, Michael was authorized to sign checks on the accounts, but all of the funds in the accounts and all income or appreciation from those funds belonged to Aileen. *Id.* The parties also stipulated that Michael wrote checks to himself or to family members from Aileen's accounts totaling more than $400,000.00. *Id.* There is no evidence that Aileen knew of or consented to Michael's withdrawals, particularly since the last one occurred while Aileen was in a coma. *Id.* The court of appeals found that the stipulations and evidence conclusively established that Michael had no claim of title to the funds, that the funds in the accounts were in Michael's care for safe keeping, that these funds were intended to be kept segregated as an intact fund, that he wrote checks or made withdrawals from these accounts in the amount of $441,796.50, and that he did so without authorization. *Id.* Based on those findings, the court of appeals held that conversion of money had been proven as a matter of law.

Here, there is testimony that, after John was hospitalized, Corrine sent Sam to the business to look after it and that she did so at John's direction. Corrine was authorized to write checks on the business' accounts; and over several months, she did issue checks to herself totaling about $9,800.00. Sam admitted to on-line transfers of funds and the use of business cash receipts to repay Corrine and American Real Estate for monies he claimed they advanced to the business to keep it going.

The general rule is that trover lies for the conversion of money only when there is an obligation resting on the defendant not to convert to his own use *specific* coin or notes. *Marston v. Hill*, 32 S.W.2d 520 (Tex. Civ. App.—El Paso 1930, no writ). If the money is not specific enough to be a chattel, then conversion will not lie because the indebtedness can be repaid by the

15

payment of money generally. *Paschal*, 215 S.W.3d at 456. In this case, the funds allegedly converted were not specific enough to become a chattel, and, even if they were, the testimony indicated that accounts and physical places where the funds were located were more akin to a river than a pond—that is, the funds were not in an intact fund or in substantially the same form in which they were received. Accordingly, we overrule this point on cross-appeal.

D.    *The Fiduciary Relationship Ended at John's Death*

The Estate sought recovery for actions by Corrine and Sam that occurred both before and after John's death. The jury found that both Corrine and Sam had fiduciary relationships with John, breached their fiduciary duties, and did so with malice. The jury assessed damages against Corrine for breach of fiduciary duty in the amount of $9,800.00 for the issuance of checks. Against Sam, the jury found damages for breach of fiduciary duty in the amount of $9,275.00 for issuance of on-line transfers; $6,090.00 for use of cash receipts; $10,000.00 for tools, equipment, tow trucks, and other assets; and $50,000.00 in lost profits, for a total of $75,365.00.

In the charge, the trial court instructed the jury that the fiduciary duty owed by Corrine and Sam "ceased to exist on the death of John William Shearer, III on December 9, 2009" and found the same as a matter of law. Based on that instruction and legal conclusion, the trial court disallowed all damages for breach of fiduciary duty that occurred after John's death. That ruling eliminated all fiduciary-duty damages awarded against Corrine and all but $1,595.00 in fiduciary damages awarded against Sam. Those damages had accrued before December 9, 2009.

The Estate asserts the trial court erred in disallowing damages on the fiduciary claims for acts done after John's death. Specifically, it contends that John's death did not terminate the

16

fiduciary duty, that the fiduciary relationships were established as a matter of law, and, in the alternative, that a new fiduciary relationship was voluntarily entered into by Corrine and Sam December 9, 2009.

Both parties cite *Pace v. McEwen*, in which the court stated, in dicta, that the fiduciary relationship between an elderly woman and her stockbroker ceased on her death. *Pace v. McEwen*, 574 S.W.2d 792, 797 (Tex. Civ. App.—El Paso 1978, writ ref'd n.r.e.). Generally, an agent is obligated to exercise a high degree of care to conserve the principal's money and to pay it only to those entitled to receive it. *City of Fort Worth v. Pippen*, 439 S.W.2d 660, 665 (Tex. 1969). The principal's funds must be kept as a separate and identifiable account. *Searle-Taylor Mach. Co. v. Brown Oil Tools, Inc*., 512 S.W.2d 335 (Tex. Civ. App.—Houston [1st Dist.] 1974, writ ref'd n.r.e.). The agent must make an accounting to the principal of any money that has come into the agent's possession because of the agency relationship. *Nat'l Sur. Co. v. McCutcheon*, 270 S.W. 1062 (Tex. Civ. App.—Fort Worth 1925, writ dism'd).

The Estate admits that the fiduciary relationships it is alleging in this case "may have terminated" at John's death, but its argument is that "the agent's fiduciary duty to account to the Decedent, and his Estate, was not abrogated by Decedent's death."[7] The Estate cites, however, no case finding a breach of fiduciary duty for actions occurring after the principal died and no case where an agent has a fiduciary duty in the absence of a fiduciary relationship. We are aware

---

[7]The Estate's pleadings seek an accounting for the alleged defalcations by Corrine and Sam, but no such request for an order granting an accounting was made to the trial court.

17

of no such case.  Accordingly, we affirm the trial court's ruling that the fiduciary duty terminated on the decedent's death.[8]

E.        *Corrine Did Demonstrate a Right to an Offset for Rent Due*

In her counterclaim, Corrine argued that, at the time of John's death, the business was in default on the lease and owed rent of $32,292.24.  The jury found that, as of the day John died, the business was in default and assessed $4,500.00 in compensation.  The $4,500.00 appears to represent two months' rent at the lease rate of $2,250.00 per month.

The Estate contends that the trial court erred in allowing Corrine an offset for breach of the lease because Corrine essentially paid herself the rent due on the lease with the disallowed damages in the form of checks, cash, and transfers she and Sam made.

The Estate cited no authority in support of this argument, and we are aware of none.  We overrule this point on cross-appeal.

---

[8]The Estate also argues that fiduciary relationships with both John and his Estate were established as a matter of law, and, in the alternative, that Corrine and Sam entered into new fiduciary relationships after John's death.  David testified that Corrine and Sam operated the business after John's death.  Sam admitted that Corrine sent him to look after the business at John's request and that he did it on John's behalf.  Sam testified that he signed checks under Corrine's delegated authority and that he "was down there for John, to take care of his business."  Sam had conversations with John's loan officer, Gary Taylor, and "Gary understood I was taking care of John's business while John was in the hospital . . . but after John's death, going into January 2010, Gary Taylor understood that my mother was the only one financially capable of helping the bank . . . ."  Corrine and John were signatories on the business' bank account.  After John's death, the bank told Corrine that she could use the account.  She acknowledged being a signatory on John's account after the divorce even though the account was for a business in which she had no ownership, directorship, or shareholder status.  She admitted that John trusted her.
      The Estate's factual arguments are moot because we affirmed the trial court's ruling that the fiduciary duty owed by Corrine and Sam terminated on John's death.  Further, the evidence in the record is insufficient to establish the alleged post-death fiduciary relationships, as a matter of law, and, even if such relationships existed, there is no jury finding that the fiduciary duties were breached.

18

*F.*     *The Jury Finding of "Willful" Conversion Fails to Support Exemplary Damages*

In its answers to jury questions numbered 1 and 5, the jury found that Corrine and Sam had converted "Tools, Equipment, Tow Trucks, and Other Assets" belonging to the Estate. Jury questions numbered 3 and 7 allowed the jury to find exemplary damages if they found that the conversionary conduct of Corrine and Sam was "willful." Corrine and Sam contend that the trial court erred in granting judgment against them "on jury questions 3 and 7 because a jury may not award exemplary damages" for willful conduct.

The Estate contends this issue was not preserved. The verdict was delivered April 12, 2012, and the judgment was signed and entered July 6, 2012. In the months between the verdict and the judgment, the trial court held two hearings on various motions filed by the parties. Corrine and Sam failed to object to the jury instructions until they filed their motion for new trial August 3, 2012, almost a month after the trial court entered its judgment of record.

To preserve a complaint for appellate review, a party must present to the trial court a timely request, motion, or objection, state the specific grounds therefore, and obtain a ruling. *See* Tex. R. App. P. 33.1(a).

In *Wal-Mart Stores*, *Inc. v. McKenzie*, a former employee sued Wal-Mart for wrongful discharge and was awarded compensatory and exemplary damages. *Wal-Mart Stores, Inc. v. McKenzie*, 997 S.W.2d 278 (Tex. 1999). When McKenzie moved for judgment on the verdict, Wal-Mart objected to the jury charge, arguing in part that the jury charge allowing punitive damages was incorrect because the controlling Texas anti-discrimination statute authorized only equitable relief and did not permit recovery for exemplary damages. *Id*. at 279–80. The trial

19

court entered judgment for McKenzie, including compensatory and exemplary damages, but the court of appeals held that Wal-Mart waived its objection to the jury charge because it failed to object to the submission of the damages issues to the jury. *Id.* The Texas Supreme Court reversed the court of appeals and held that Wal-Mart's objection was timely enough "to give the trial court an opportunity to resolve the legal issue before rendering judgment." *Id.* at 280; *see also Holland v. Wal-Mart*, 1 S.W.3d 91 (Tex. 1999) (objection raised in motion for judgment notwithstanding verdict preserved Wal-Mart's claim that attorney's fees not recoverable under claim submitted to jury).

As in *McKenzie*, whether exemplary damages may be awarded for willful conversion is a question of law, and the jury's findings are immaterial to the ultimate issue of whether exemplary damages are available for willful conversion. *McKenzie*, 997 S.W.2d at 279; *see Holland*, 1 S.W.3d at 875. Here, the objection was made in a motion for new trial, after the judgment was rendered, but before the trial court's plenary power expired, thereby giving "the trial court an opportunity to resolve the legal issue." *McKenzie*, 997 S.W.2d at 280. Accordingly, the objection was timely, and the issue was preserved for our review.

Here, the jury questions allowed the jury to award exemplary damages for "willful" conduct. But exemplary damages may be awarded only if the claimant proves by clear and convincing evidence that the harm resulted from fraud, malice, or gross negligence. TEX. CIV. PRAC. & REM. CODE ANN. § 41.003(a) (West Supp. 2012). Judgment for exemplary damages should not have been entered. We sustain this point of error and reverse the award of exemplary damages for conversion against Corrine and Sam.

20

*G.      Remaining Exemplary Damages Should Have Been Reviewed for Proportionality*

Corrine and Sam also contend that, because the trial court reduced the damages awarded against Sam, the trial court erred by failing to conduct a post-reduction review of whether the exemplary damage award was reasonable and proportionate.  We agree.

Here, the jury found that Sam owed and breached a fiduciary duty to John.  The jury assessed fiduciary-duty damages against Sam totaling $75,365.00. The jury then awarded the Estate exemplary damages against Sam in the amount of $120,909.00.  After the trial court disallowed most of the breach of duty damages assessed against Sam, the final judgment awarded fiduciary damages against Sam of only $1,595.00, but left intact the original exemplary damage award of $120,909.00.

Corrine and Sam contend that, after reducing the actual damages awarded, the trial court should have conducted a review of the exemplary damage award to determine if it was reasonable and proportionate in light of the reduction.  *See State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 426 (2003).  In *Campbell*, a court of appeals reduced the compensatory damages awarded, but the United States Supreme Court reversed because there should have been a review of whether the exemplary damages were "reasonable and proportionate to the amount of harm to the plaintiff and to the general damages recovered" in light of the reduction.  *Id.*  Corrine and Sam argue that, since the court of appeals in *Campbell* had to conduct an exemplary damages review after reducing the actual damages, the trial court here was required to do so as well.

21

The Estate contends that (1) the trial court did not reduce the damages, but disallowed the $9,275.00 award because the evidence supporting conversion of money was legally insufficient; (2) the $6,090.00 award was reduced to $1,595.00 because $4,495.00 was converted after the decedent's death, when, the court held, the fiduciary duty Sam and Corrine owed John had ended; (3) the $10,000.00 award was disallowed because it was a duplication of the same award made against Sam for conversion, and the Estate had elected to recover for the conversion; and (4) the $50,000.00 award for lost profits was disallowed because the trial court held that the Estate could not legally recover both fair market value and lost profits.

Corrine and Sam contend that, here, the trial court erred as "Sam was denied his right to due process because the Trial Court performed no reasonable and proportionate review of the exemplary damages awarded against him by the jury's answer to Question 18."

In a letter dated July 3, 2012, three days before the judgment, Sam and Corrine objected to the exemplary damage award in Question 18:

> The Court, in effect has changed the jury's verdict as to damages in Question 16 from $75,265.00 to $1,595.00. The evidence is wholly insufficient to establish that the jury verdict in Question 18 of $120,909.00 would be the same if the jury failed to find that 98% of such actual damages did not exist.

On July 6, 2012, the same day the letter was filed of record, the trial court signed and entered the judgment. At the hearing on the motion for new trial and motion to correct and reform the judgment, Sam again argued that the trial court has "got to consider and make -- and the Court must do this, and make a determination of whether or not the [exemplary damages] should also be proportionately reduced." In its ruling on the motion for new trial, the court made specific note of Sam's request:

22

Court's going to note one thing: With regard to the amount of exemplary damages and the request to have this Court reduce the exemplary damages, in light of the Court's reduction of damages being awarded under the judgment, as compared to the verdict as to Sam Hill, Court's finding that the jury's award of exemplary damages did not appear to be commensurate with the amount of damages awarded, and was -- there was no relation to the amount of damages awarded as to Sam Hill and the amount of exemplary damages awarded as against Sam Hill. The Court is not going to reduce the amount of exemplary damages found against Mr. Sam Hill as a result of the reduction of the judgment.

An exemplary damage award must be reasonably proportioned to actual damages. *Alamo Nat'l Bank v. Kraus*, 616 S.W.2d 908, 910 (Tex. 1981). The trial court must consider several factors in determining whether an award of exemplary damages is reasonable, such as (1) the nature of the wrong, (2) the character of the conduct involved, (3) the degree of culpability of the wrongdoer, (4) the situation and sensibilities of the parties concerned, and (5) the extent to which such conduct offends a public sense of justice and propriety. *Id.*

There is nothing in this record to show that the trial court considered the required factors or made a determination that the exemplary damage award was reasonable. Accordingly, we sustain this point of error, reverse the award of exemplary damages for breach of fiduciary duty against Sam, and remand the case for a determination of the reasonableness and proportionality of the exemplary damage award, in light of the reduction in actual damages.

We reverse the trial court's award of exemplary damages against Corrine and Sam for conversion, because exemplary damages may not be awarded for "willful" conduct. We reverse and remand the trial court's award of exemplary damages against Sam for breach of fiduciary duty and remand the case for a review of that exemplary damage award in light of the reduced actual damages. In all other respects, we affirm the trial court's judgment.

Josh R. Morriss, III
Chief Justice

Date Submitted:     May 15, 2013
Date Decided:       July 16, 2013